# In the United States District Court

# For the District of Maryland

## (Northern Division)

Civil Action No._____

**FILED *IN CAMERA* AND UNDER SEAL**

**United States of America *ex rel.* Charles E. Moore,**

*Plaintiff,*

v.

**Robert S. Svehlak, *et al.*,**

*Defendants.*

# PLAINTIFF'S COMPLAINT
# PURSUANT TO 31 U.S.C. §3729 *et seq.*

Jason E. Rheinstein, Esq.
P.O. Box 1369
Severna Park, MD 21146
(410) 647-9005
*jason@jer-consulting.com*
***Attorney for Relator***

JULY 12, 2012

# TABLE OF CONTENTS

LIST OF EXHIBITS................................................................................................................ii

LIST OF FIGURES ...............................................................................................................ii

LIST OF TABLES ...............................................................................................................iii

I.   INTRODUCTION ....................................................................................................... 2

   A.  The False Claims Act................................................................................................ 8

   B.  FHA Mortgage Insurance Fraud ............................................................................. 9

II.  JURISDICTION AND VENUE ................................................................................ 11

III. PARTIES ................................................................................................................... 11

   A.  Imagine Capital Enterprise Principals .................................................................. 11

   B.  Imagine Capital Enterprise Lending Entities........................................................ 12

   C.  Imagine Capital Enterprise Straw Borrower Land Holding Companies ............... 13

   D.  Imagine Capital Enterprise Direct Land Holding Companies .............................. 15

   E.  Direct Endorsement Lenders................................................................................. 17

IV. APPLICABLE LAW ................................................................................................. 18

   A.  The National Housing Act of 1934 (12 U.S.C. §1707 et seq., as amended) ...................... 18

   B.  The False Claims Act (31 U.S.C. §3729 et seq.) ................................................. 20

V.  FACTUAL ALLEGATIONS ..................................................................................... 21

   A.  An Elaborate Scheme to Procure Fraudulent Conventional and  Government-Insured
      Mortgages to Build a Hard-Money Lending Enterprise .................................................... 21

     1.  Overview of a Fraudulent Enterprise ............................................................. 21

     2.  Imagine Capital's Loans Closely Track Conventional and Gov't-Insured Mortgages.. 33

     3.  Relatively Few Properties Actually Improved Despite a Large Number of Cover Loans
        with a Purported "Rehabilitation" Component and Unjustifiably High Loan Principal
        Amounts ......................................................................................................... 38

     4.  Sham Loans to Straw Borrower Land Holding Companies Facilitate Fraudulent
        Mortgages – Lex Real Estate Holdings, LLC ................................................ 45

     5.  A Series of Patterns Emerge for Using the Sham Loans to Faciliate
        the Procurement of Fraudulent Mortgages..................................................... 53

   B.  General Failure to Discharge Duties of the Direct Endorsement Lender Program .......... 70

   C.  Specific Counts .................................................................................................... 74

# LIST OF EXHIBITS

Exhibit 1...Basic List of Subject Conventional and Government-Insured Mortgage
Transactions (13 pp.)

Exhibit 2...Summary Report of Loans by the Imagine Capital Lending Enterprise (20 pp.)

Exhibit 3...Loan Typing Descriptions and Assignments for the
Imagine Capital Enterprise Loans (4 pp.)

Exhibit 4...Base List of Subject Properties Associated with the
Imagine Capital Enterprise (22 pp.)

Exhibit 5...Subject Property Permit Report for Baltimore City "Acquisition + Rehab" Loans with
Subsequent Mortgage Information on Subject Properties (9 pp.)

# LIST OF FIGURES

Figure 1 ....The Imagine Capital Lending Enterprise ................................................................ 23

Figure 2 ....Cumulative Aggregate Amounts of Loans Recorded and Released by the
Imagine Capital Enterprise vs. Time ....................................................................... 31

Figure 3 ....Cumulative Aggregate Amounts of Conv. & Government-Insured3
Mortgages on Subject Properties vs. Time .............................................................. 33

Figure 4 ....Cumulative Aggregate Principal Amount of all Subject Mortgages vs. Time ......... 35

Figure 5 ....Cumulative Aggregate Amounts of Government-Insured Mortgages by
Fraud Propensity vs. Time ....................................................................................... 36

Figure 6 ....Cumulative Aggregate Amounts of Purported Imagine Capital Loans and
Conventional and Government-Insured Mortgages on
Subject Properties vs. Time ..................................................................................... 37

Figure 7 ....Number of Baltimore City Properties Having the
Specified Number of Permits during its Respective Imagine Capital
Enterprise Type 2 Loan Period ................................................................................ 41

# LIST OF TABLES

Table 1 .....Overview of the Imagine Capital Enterprise ............................................................ 24

Table 2 .....Overview of Recorded Loans Originated and Released by Entity ........................... 25

Table 3 .....Recorded Imagine Capital Enterprise Loans Purportedly
Originated and Released by Year ........................................................................... 29

Table 4 .....Total Imagine Capital Enterprise Loans Purportedly
Originated and Released by Loan Type.................................................................... 30

Table 5 .....Imagine Capital Enterprise Secured Properties by Jurisdiction................................ 32

Table 6 .....Summary Statistics for Imagine Capital Single-Property "Acquisition + Rehab"
(Type 2) Loans on Properties in Baltimore City...................................................... 43

Table 7 .....Top 20 Primary Guarantors by Aggregate Principal Amount of
Imagine Capital Loans .............................................................................................. 46

Table 8 .....Top 20 Primary Guarantors by Aggregate Number of Loans................................... 47

Table 9 .....Examples of Suspected Sham Loans by Imagine Capital to the
Straw Borrower Land Holding Companies............................................................... 48

Table 10 ...Summary Information Regarding Subsequent Mortgages and Dispositions for
Properties Securing Sham Loan From Imagine Capital to
Lex Real Estate Holdings, LLC ............................................................................... 51

Table 11 ...Calculation of Total Allocated Amount Purportedly Loaned by Imagine Capital
for Each of the Properties Securing Sham Loan by Imagine Capital to
Lex Real Estate Holdings, LLC ............................................................................... 52

Table 12 ...Examples of Suspected Fraudulent Government-Insured Mortgages Procured
Through the Direct Borrower Resale and "Subsequent Purchaser"
Acquisition Mortgage Scenario ............................................................................... 57

Table 13    Additional Information Pertaining to Examples of Suspected Fraudulent
Government-Insured Mortgages ............................................................................... 58

Table 14 ...Rollup of Scenarios Pertaining to Procurement of Conventional and
Government-Insured Mortgages ............................................................................... 69

Table 15 ...Estimated Number of Subject Government-Insured Mortgages Originated
by Direct Endorsement Lender Defendants by Estimated Fraud Rating.................. 70

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *Ex rel.* Charles E. Moore, | ) | |
| | ) | Civil Action No._____ |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **FILED *IN CAMERA* AND** |
| | ) | **UNDER SEAL** |
| ROBERT S. SVEHLAK, | ) | |
| NEIL D. ROSEMAN, | ) | **FALSE CLAIMS ACT** |
| IMAGINE CAPITAL, INC., | ) | **FHA LOAN FRAUD** |
| LEADPROBE, INC., | ) | |
| FORESITE INVESTMENTS, LLC, | ) | |
| LEX REAL ESTATE HOLDINGS, LLC, | ) | |
| 3814 BEEHLER AVE., LLC, | ) | |
| 1607 GILMOR, LLC, | ) | |
| 1615 GILMOR, LLC, | ) | |
| 3307 HENRY G. PARKS, JR., LLC, | ) | |
| 4917 PALMER, LLC, | ) | |
| 1912 ETTING ST., LLC, | ) | **JURY TRIAL DEMANDED** |
| 1724 MCKEAN, LLC, | ) | |
| 1834 EAST NORTH AVENUE, LLC, | ) | |
| 3425 PARK HEIGHTS REAL ESTATE | ) | |
| HOLDINGS, LLC, | ) | |
| 5214 BEAUFORT AVE., LLC, | ) | |
| BOOMERANG PROPERTIES, LLC, | ) | |
| J.A.W. ENTERPRISE, LLC, | ) | |
| BSQUARED REAL ESTATE | ) | |
| HOLDINGS, LLC, | ) | |
| CASTLE PROPERTIES, LLC, | ) | |
| WEST BALTIMORE TREASURES, LLC, | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| FIRST HOME MORTGAGE CORPORATION, | ) | |
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

1

## PLAINTIFFS' COMPLAINT
## PURSUANT TO 31 U.S.C. §§ 3729-3732 OF
## THE FEDERAL FALSE CLAIMS ACT

The United States of America, by and through *qui tam* relator Charles E. Moore (hereinafter the "Relator"), brings this action pursuant to 31 U.S.C. §3729, *et seq.*, as amended (hereinafter "the False Claims Act") to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States of America (alternatively referred to hereafter as "the Government").

## I.   INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America, for violations of the False Claims Act arising from false or fraudulent records, statements, or claims, or any combination thereof, made, used or caused to be made, used, or presented, or any combination thereof, by the defendants, their agents, employees, or co-conspirators, or any combination thereof, with respect to false claims made for mortgage insurance by the Federal Housing Administration (FHA).

2.     The case arises out of failed attempt by two individuals to start and fund an unregulated private finance "hard money" lending operation entirely on fraudulently procured conventional and Government-insured mortgages.

3.     In the mid-2000s, Defendants Robert S. Svehlak ("Svehlak") and Neil D. Roseman ("Roseman"), two former veterans of the S&A Restaurant Corporation, wanted to become players in the booming real estate investment market when it seemed that any property – no matter how good or bad – could be bought and sold at a profit.

4.     Unfortunately, Svehlak and Roseman did not have sufficient capital to build the business they wanted, but they were nonetheless determined to find another way.

5.     Upon information and belief, Svehlak and Roseman came up with a plan – they could obtain capital from fraudulent conventional and Government-insured mortgages, which generally had low interest rates and long terms and then use that capital to fund short-term high-interest "hard money" loans. Svehlak and Roseman could then use the money they earned from these loans to service the debt on the fraudulent mortgages and build their real estate investment portfolio.

6.     Upon information and belief, the plan was put in action in early 2006, and with the founding of Imagine Capital in July of that year; Svehlak and Roseman began offering their customers "hard money made easy."[1]

7.     Upon information and belief, Svehlak and Roseman would finance their "hard money" lending operation (hereinafter "the Imagine Capital Enterprise") almost entirely with fraudulent conventional and Government-insured mortgages.

8.     Upon information and belief, approximately 192 of the 328 properties on which the Imagine Capital Enterprise recorded a security interest subsequently served as collateral for a conventional or Government-insured mortgage.

9.     Upon information and belief, the Imagine Capital Enterprise was funded by a large number of fraudulent conventional and Government-insured mortgages on at least 192 different properties in which the Imagine Capital Enterprise has been associated.     A list of the 192 conventional and Government-insured mortgages is attached hereto as **EXHIBIT 1**, entitled *Basic List of Subject Conventional and Government-Insured Mortgage Transactions*. Exhibit 1 is incorporated by reference as if fully restated herein.

---

[1] As used herein, the term "loans" refers to Imagine Capital Enterprise transactions, while the term "mortgage" is generally used to refer to secured transactions involving and other legitimate mortgage originators.

10. In December 2005, mere months after the completion of his Chapter 7 Bankruptcy Action, Neil Roseman, a lead paint inspector, began using his company LeadProbe to make short-term "hard-money" loans for real estate investment projects in Maryland.[2]

11. A few months later, in March 2006, the first of the 192 conventional and Government-insured mortgages that would finance Imagine Capital would be recorded.

12. Upon information and belief, for as long as the mortgages kept freely flowing, Svehlak and Roseman's plan continued to be a success.

13. Upon information and belief, throughout 2006 and 2007, while it was still easy to obtain new mortgages, the plan enabled Svehlak and Roseman to purportedly consummate millions of dollars in transactions, and by the end of 2007, the Imagine Capital Enterprise had recorded deeds of trust in the Land Records of Maryland purporting to memorialize nearly $12 Million in loan originations – everything seemed just great.

14. Upon information and belief, in the long-term, however, as the credit markets tightened and it became increasingly difficult to procure fraudulent conventional and Government-insured mortgages, Svehlak and Roseman's scheme would begin to crumble – slowing revenue would make it more difficult to service the debt on the old fraudulently-procured conventional and Government-insured mortgages, and Svehlak and Roseman would become increasingly desperate to find ways to collect money that could be used to keep their Ponzi scheme afloat.[3]

---

[2] *See In Re* Neil David Roseman *et al.*, Case No. 1:04 bk-26610 (Bankr. D. Md. 2004).
[3] Upon information and belief continued debt service on the earlier mortgages was critical because a large number of simultaneous defaults would likely lead to detection.

15.     Upon information and belief, Svehlak and Roseman would find some new ways to keep their enterprise sputtering along.[4]

16.     Upon information and belief, increasingly sloppy transactions, and obvious sham loans to straw borrower land holding companies would begin to characterize Svehlak and Roseman's operation.

17.     Upon information and belief, however, nothing could ever replace those free-flowing conventional mortgages that had first propelled Imagine Capital, and over time the Enterprise would continue on a steady decline.

18.     Upon information and belief, the Imagine Capital Enterprise was principally developed and managed by Svehlak and Roseman, and also included a network of straw borrowers, straw buyers and land holding companies, to be discussed *infra*.

19.     Upon information and belief, the Enterprise is comprised of a network of individuals and entities, including, but not limited to: (1) the principals of the enterprise; (2) three lending entities; (3) five direct land holding companies; (4) 11 straw borrower land holding companies; and (4) a countless number of additional individuals and entities that also served as straw borrowers and fake guarantors to facilitate the procurement of fraudulent conventional and Government-insured mortgages.

20.     Upon information and belief, between 2005 and early 2012, the Imagine Capital Enterprise operated a sham "hard money" (private finance) operation that in the end  was nothing more than a cover for bank fraud, mortgage fraud, and money laundering.

21.     Upon information and belief, between 2005 and 2012, the Imagine Capital Enterprise recorded documents purporting to memorialize 323 loan transactions, aggregating

---

[4] For example, in April 2008, Svehlak and his wife, Beverly Svehlak mortgaged their previously-unencumbered Arnold, Maryland residence for $1,000,000.

more than $24 Million, on 328 residential properties in Baltimore City and other Maryland jurisdictions.

22.    Upon information and belief, the total aggregate amount of all the conventional and Government-insured mortgages in the 192 transactions in Exhibit 1 was approximately $25 Million.

23.    Upon information and belief, the great majority of the purported loan transactions recorded by the Imagine Capital Enterprise were sham transactions to straw borrowers for the purpose of facilitating the procurement of fraudulent conventional and Government-insured mortgages.

24.    Upon information and belief, a significant portion of the proceeds obtained from fraudulent conventional or Government-insured mortgages was reinvested and laundered in the Enterprise and used to make purported "hard money" loans to legitimate "would-be borrowers" looking to acquire or rehabilitate investment properties.

25.    Upon information and belief, in many cases, rather than consummate the transactions as agreed with legitimate "would-be borrowers," the Enterprise would inevitably dupe those borrowers in order to obtain control of properties that could serve as collateral for more fraudulent conventional and Government-insured mortgages.[5]

26.    Upon information and belief, the Enterprise or its principals paid debt service on many of the fraudulently-procured mortgages in order to avoid massive defaults that may have led to easy detection.

---

[5] Upon information and belief, the duped legitimate borrowers would ultimately be forced to convey a subject property to an individual or entity affiliated with the Enterprise, who was subsequently to obtain a fraudulent mortgage. In some cases, rather than a voluntary conveyance, the Enterprise is believed to have initiated foreclosure proceedings to obtain control of properties that it sought to use as collateral for new fraudulent conventional or Government-insured mortgages.

27.     Upon information and belief, the aggregate total principal amount of potentially fraudulent (including conventional and Government-insured) mortgages arising out of the Imagine Capital Enterprise was between $11.5 million and $18.5 million dollars and involved somewhere between 99 and 154 secured properties.[6]

28.     Upon information and belief, approximately 59 of the subject mortgage transactions shown in Exhibit 1 were Government-insured mortgages, including 57 FHA-insured mortgages and 2 mortgages insured by the U.S. Department of Veterans Affairs.

29.     Upon information and belief, as many as 35 to 40 of the 59 Government-insured mortgage transactions shown in Exhibit 1 were fraudulent.

30.     Upon information and belief, approximately 40 of the 192 mortgage transactions in Exhibit 1 are the subject of a current or completed bank foreclosure action.

31.     Upon information and belief, completed foreclosure actions on the mortgage transactions (including conventional mortgage transactions), as shown in Exhibit 1, have already resulted in losses to banks and the Government of approximately $3 Million.[7]

32.     Upon information and belief, the total potential losses arising out of this scheme to both the Government and financial institutions is estimated at around $15 Million with the total potential loss arising out of the fraudulent Government-insured mortgages accounting for $4 Million to $5 Million of the total, and the losses to FDIC-insured financial institutions and other legitimate lenders, from fraudulent conventional mortgages, accounting for the remaining $10 Million of projected losses.

---

[6] An estimated $3.5 Million to $5 Million of this total was derived from suspected fraudulent Government-insured mortgages. Pursuant to 31 U.S.C. §3729, this Complaint specifically seeks recovery of losses to the Government for the Government-insured mortgages.
[7] This amount includes approximately $300,000 of losses that have already been sustained by the Government in three completed foreclosure actions on fraudulent FHA-insured mortgages.

33.     Upon information and belief, none of the information in this Complaint has been publicly disclosed.

34.     The Relator is the original source of all information in this Complaint.

35.     This action seeks to recovery for the Government of any and all losses sustained arising out any and all of the 59 Government-insured mortgages listed in Exhibit 1 that are fraudulent.[8]

## A.     The False Claims Act

36.     The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud was pervasive in federal programs, and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

37.     The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

38.     The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days

---

[8] Upon information and belief, three of the Government-insured mortgages have already been through foreclosure and generated claims, and many more are currently in foreclosure.

(without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

39. The Act requires that the Relator be the original source of information and that the information not have already been publicly disclosed.

## B. FHA Mortgage Insurance Fraud

40. The Federal Housing Administration ("FHA") of the Department of Housing and Urban Development ("HUD") is the largest mortgage insurer in the world. FHA mortgage insurance makes home ownership possible for millions of American families by protecting lenders against defaults on mortgages, thereby encouraging lenders to make loans to borrowers who might not be able to meet conventional underwriting requirements. FHA accepts a fixed level of risk set by statute and HUD rules. FHA relies on this fixed level of risk to set appropriate mortgage insurance premiums to offset the costs of paying FHA insurance claims. By controlling risk and setting appropriate insurance premiums, FHA has been able to operate based solely on the income it generates from mortgage insurance premium proceeds. Since its inception in 1934, FHA has insured more than 34 million home mortgages. FHA currently insures approximately one third of all new residential mortgages in the United States.

41. To assist as many qualified homeowners as possible, and to provide maximum economic opportunities to lenders interested in obtaining FHA insurance on mortgages, FHA operates a Direct Endorsement Lender program with lenders in the private sector. The Direct Endorsement Lender program grants participating lenders the authority to endorse mortgages that are qualified for FHA insurance. In reviewing mortgages for eligibility for FHA insurance, Direct Endorsement Lenders are entrusted with safeguarding the public from taking

on risks that exceed statutory and regulatory limits. Direct Endorsement Lenders act as fiduciaries of HUD in underwriting mortgages and endorsing them for FHA insurance.

42. The integrity of the Direct Endorsement Lender program requires participating Direct Endorsement Lenders to carefully review mortgages to ensure compliance with HUD rules. HUD entrusts Direct Endorsement Lenders with great responsibility, and therefore places significant emphasis on the lenders' qualifications. To qualify as a Direct Endorsement Lender, a lender must implement a mandatory quality control plan. Quality control plans are necessary to ensure that Direct Endorsement Lenders follow all HUD rules, and to provide procedures for correcting problems in a lender's underwriting operations.

43. An essential part of every quality control plan is the auditing of all early payment defaults, *i.e.*, those mortgages that default soon after closing. Early payment defaults may be signs of problems in the underwriting process. By reviewing early payment defaults, Direct Endorsement Lenders are able to monitor those problems, correct them, and report them to HUD. Every Direct Endorsement Lender must make an annual certification of compliance with the Direct Endorsement Lender program's qualification requirements, including the implementation of a mandatory quality control plan.

44. On a mortgage-by-mortgage basis, HUD requires Direct Endorsement Lenders to conduct due diligence to ensure that each mortgage is eligible for FHA insurance as set forth in HUD rules. These rules exist to prevent HUD from insuring mortgages that are fraudulent or otherwise exceed the risk levels set by statute and regulations. A Direct Endorsement Lender must assure HUD that every endorsed mortgage meets all HUD rules. HUD requires the Direct Endorsement Lender to certify, for each mortgage the lender endorses, that the lender has conducted due diligence in accordance with all HUD rules.

Absent a truthful mortgage eligibility certification, a Direct Endorsement Lender cannot endorse a mortgage for FHA insurance.

## II.    **JURISDICTION AND VENUE**

45.     This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331 and 1345, and the Court's general equitable jurisdiction.

46.     Venue is appropriate in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (c) because the transactions giving rise to this Complaint occurred in this judicial district. Furthermore, the defendants transact significant business within this district and are subject to personal jurisdiction in this judicial district.

## III.    **PARTIES**

47.     Relator Charles E. Moore (hereinafter "Moore") is an individual Maryland resident whose address is 370 Magothy Road, Severna Park, Maryland 21146. Moore is a former mortgage broker with significant knowledge and experience pertaining to FHA loan programs and real estate transactions.

### A. *Imagine Capital Enterprise Principals*

48.     Defendant Robert S. Svehlak (hereinafter "Svehlak") is an individual Maryland resident whose address is 925 Placid Court, Arnold, Maryland 21012. Svehlak is believed to have been the person generally responsible for or in charge of the enterprise described in this Complaint, the purpose of which was to procure fraudulent conventional and Government-insured mortgages on properties in Baltimore City and other Maryland jurisdictions.

49.     Defendant Neil D. Roseman (hereinafter "Roseman") is an individual Maryland resident whose address is 2905 Thornbrook Drive, Ellicott City, Maryland 21042. Upon

information and belief, Roseman is the second of two principals that owned and operated the Imagine Capital Enterprise. Upon information and belief, Roseman actually served as second to Svehlak for most of the period of operations of the enterprise described in this Complaint, the purpose of which was to procure fraudulent conventional and Government-insured mortgages on properties in Baltimore City and other Maryland jurisdictions.

## B.    *Imagine Capital Enterprise Lending Entities*

50.    Defendant Imagine Capital, Inc. (hereinafter "Imagine Capital") is a Maryland corporation with principal offices at 925 Placid Court, Arnold, Maryland 21012. Imagine Capital was established by Svehlak and Roseman in July 2006. Upon information and belief, Imagine Capital served as the principal entity from which Svehlak and Roseman underwrote sham loans to facilitate the procurement of fraudulent conventional or Government-insured mortgages on properties in Baltimore City and other Maryland jurisdictions.

51.    Defendant LeadProbe, Inc. (hereinafter "LeadProbe") is a Maryland corporation with principal offices at 2905 Thornbrook Road, Ellicott City, Maryland 21042. LeadProbe was established by Roseman on or about July 2, 2005. Upon information and belief, LeadProbe was established for the dual purpose of performing lead paint inspections and underwriting sham loans to facilitate the procurement of fraudulent conventional or Government-insured mortgages.

52.    Defendant ForeSite Investments, LLC (hereinafter "ForeSite") is a Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. ForeSite was established by Svehlak on or about January 6, 2012. Upon information and belief, ForeSite operates with a mailing address of P.O. Box 178, Arnold, Maryland 21012. Upon information and belief, the purpose of ForeSite is to continue operations of Svehlak and

Roseman's fraudulent enterprise under the umbrella of a new entity after a state court made findings of fraud with respect to operational activities of Imagine Capital in December 2011.

53.     Collectively, Defendants Imagine Capital, LeadProbe, and ForeSite are hereafter referred to as "the Imagine Capital Enterprise Lending Entities."

### C.     Imagine Capital Enterprise Straw Borrower Land Holding Companies

54.     Defendant Lex Real Estate Holdings, LLC (hereinafter "LREH") is a defunct Maryland limited liability company with a principal address of 925 Placid Court, Arnold, Maryland 21012. LREH was established by Svehlak on or about January 3, 2008. Upon information and belief, the purpose of LREH was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least three properties.

55.     Defendant 3814 Beehler Ave., LLC (hereinafter "Beehler Ave.") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Beehler Ave. was established by Svehlak on or about July 10, 2007. Upon information and belief, the purpose of Beehler Ave. was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

56.     Defendant 1607 Gilmor, LLC (hereinafter "1607 Gilmor") is a Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. 1607 Gilmor was established by Svehlak on or about September 3, 2008. Upon information and belief, the purpose of Gilmor was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

57.     Defendant 1615 Gilmor, LLC (hereinafter "1615 Gilmor") is a Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. 1615 Gilmor was established by Svehlak on or about September 8, 2008. Upon information

and belief, the purpose of 1615 Gilmor was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

58. Defendant 3307 Henry G. Parks, Jr., LLC (hereinafter "Henry Parks LLC") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Upon information and belief, the purpose of Henry Parks LLC was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

59. Defendant 4917 Palmer, LLC (hereinafter "Palmer Ave. LLC") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Palmer Ave. LLC was established by Svehlak on or about September 3, 2008. Upon information and belief, the purpose of Palmer was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

60. Defendant 1912 Etting St., LLC (hereinafter "Etting St. LLC") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Defendant Etting St. LLC was established by Svehlak on or about April 16, 2009. Upon information and belief, the purpose of Etting St. LLC was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

61. Defendant 1724 Mckean, LLC (hereinafter "Mckean LLC") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Mckean LLC was established by Svehlak on or about September 29, 2008. Upon information and belief, the purpose of Mckean LLC was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

62.     Defendant 1834 East North Avenue, LLC (hereinafter "East North LLC") is a Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. East North LLC was established by Svehlak on or about January 2, 2009. Upon information and belief, the purpose of East North LLC was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

63.     Defendant 3425 Park Heights Real Estate Holdings, LLC (hereinafter "PHREH") is a defunct Maryland limited company with principal offices at 925 Placid Court, Arnold, Maryland 21012. PHREH was established by Svehlak on or about September 3, 2008. Upon information and belief, the purpose of PHREH was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

64.     Defendant 5214 Beaufort Avenue, LLC (hereinafter "Beaufort Ave. LLC") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Beaufort Ave. LLC was established by Svehlak on or about July 10, 2007. Upon information and belief, the purpose of Beaufort Ave. LLC was to facilitate the procurement of fraudulent conventional or Government-insured mortgages on at least one property.

65.     Collectively, Defendants LREH, Beehler Ave., 1607 Gilmor, 1615 Gilmor, Henry Parks LLC, Palmer Ave. LLC, Etting St. LLC, McKean LLC, East North LLC, PHREH and Beaufort Ave. LLC are hereafter referred to as the "Imagine Capital Straw Borrower Land Holding Companies."

*D.     Imagine Capital Enterprise Direct Land Holding Companies*

66.     Defendant Boomerang Properties, LLC (hereinafter "Boomerang") is a Maryland limited liability company with principal offices at 925 Placid Court, Arnold,

15

Maryland 21012. Boomerang was established by Svehlak on or about April 23, 2009. Upon information and belief, the purpose of Boomerang was to act as a shell holding company for properties that could be used as collateral to obtain fraudulent conventional or Government-insured mortgages.

67.     Defendant J.A.W. Enterprise, LLC (hereinafter "JAW") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. JAW was established by Svehlak on or about February 4, 2010. Upon information and belief, the purpose of JAW was to act as a shell holding company for properties that could be used as collateral to obtain fraudulent conventional or Government-insured mortgages.

68.     Defendant BSquared Real Estate Holdings, LLC (hereinafter BSquared") is a defunct Maryland limited liability company established by Svehlak on or about June 5, 2006. Upon information and belief, the purpose of BSquared was to acquire and serve as a shell holding company for properties that could be used as collateral to obtain fraudulent conventional or Government-insured mortgages.

69.     Defendant Castle Properties, LLC (hereinafter "Castle") is a defunct Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Castle was established by Svehlak on or about April 15, 2009. Upon information and belief, the purpose of Castle was to serve as a shell holding company for properties that could serve as collateral for fraudulent conventional and Government-insured mortgages.

70.     Defendant West Baltimore Treasures, LLC (hereinafter "WBT") is a Maryland limited liability company with principal offices at 925 Placid Court, Arnold, Maryland 21012. Upon information and belief, the purpose of WBT is to serve as a shell holding company for properties that can serve as collateral for fraudulent conventional and Government-insured

mortgages. Upon information and belief, Svehlak founded WBT on or about April 10, 2012 because of fears regarding potential exposure for Boomerang arising out of findings of fraud by the Circuit Court for Baltimore City in a state court action involving the Relator.

71.     Collectively, Defendants Boomerang, JAW, BSquared, Castle, and WBT are hereafter referred to as the "Imagine Capital Direct Land Holding Companies."

72.     Collectively, the Imagine Capital Enterprise Lending Entities, the Imagine Capital Enterprise Straw Borrower Land Holding Companies, and the Imagine Capital Enterprise Direct Land Holding Companies are hereafter referred to as "the Imagine Capital Defendants."

## E.     Direct Endorsement Lenders

73.     Defendant Wells Fargo Bank, N.A. (hereinafter "Wells Fargo"), is a Minnesota corporation with principal offices located at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104. Wells Fargo regularly does business in this judicial district. Upon information and belief, Wells Fargo is a Direct Endorsement Lender. CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 1660, Baltimore, Maryland 21202, serves as the resident agent of Wells Fargo.

74.     Defendant First Home Mortgage Corporation (hereinafter "First Home Mortgage") is a Maryland corporation with principal offices at Suite 130, 5355 Nottingham Drive, Baltimore, Maryland 21236. Upon information and belief, First Home Mortgage is a Direct Endorsement Lender. Catherine A. Smith, Suite 130, 5355 Nottingham Drive, Baltimore, Maryland 21236, serves as the resident agent of First Home Mortgage.

75.     Defendant Bank of America, N.A. (hereinafter "Bank of America") is a corporation that regularly conducts business in this judicial district. Its principal offices are

located at 100 North Tryon Street, Charlotte, North Carolina 28255. Upon information and belief, Bank of America is a Direct Endorsement Lender. The Corporation Trust Incorporated, 351 West Camden Street, Baltimore, Maryland 21201 serves as the resident agent of Bank of America.

76. Collectively, Defendants Wells Fargo, First Home Mortgage and Bank of America are hereafter referred to as "the Direct Endorsement Lender Defendants."

## IV. **APPLICABLE LAW**

*A. The National Housing Act of 1934 (12 U.S.C. §1707 et seq., as amended)*

77. FHA is the largest insurer of residential mortgages in the world. Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs. Through these programs, FHA insures approved lenders against losses on mortgage loans. FHA mortgage insurance may be granted on mortgages used to purchase homes, improve homes, or to refinance existing mortgages. FHA's single-family mortgage insurance programs cover owner-occupied principal residences.

78. FHA mortgage insurance programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans. FHA mortgage insurance encourages lenders to make loans to otherwise creditworthy borrowers and projects that might not be able to meet conventional underwriting requirements by protecting the lenders against defaults on mortgages.

79. To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements. Those requirements relate to, among other things, the adequacy of the borrower's income to meet the mortgage payments and other obligations, the

borrower's creditworthiness, and the appropriateness of the valuation of the property subject to the mortgage.

80.    HUD operates the Direct Endorsement Program as part of the FHA-insured mortgage program. Under the Direct Endorsement process, HUD does not itself conduct a detailed review of applications for mortgage insurance before an FT-IA-insured mortgage closes.  Rather, approved lenders, called Direct Endorsement Lenders, must determine whether the proposed mortgage is eligible for FHA insurance under the applicable program regulations. A Direct Endorsement Lender underwrites and closes mortgages without prior HUD review or approval. Direct Endorsement Lenders submit documentation regarding underwritten loans after the mortgage has closed, and certifies that the endorsed mortgage complies with HUD rules.

81.    The Direct Endorsement Program works as follows: The Direct Endorsement Lender originates a proposed loan, or in some instances, acts as a sponsoring lender by underwriting and funding proposed mortgages originated by other FHA lenders known as loan correspondents. In either case, the Direct Endorsement Lender ultimately reviews the proposed mortgage. The borrower, along with the Direct Endorsement Lender's representative, completes the loan application. A loan officer collects all supporting documentation from the borrower and submits the application and documentation to the Direct Endorsement Lender, The Direct Endorsement Lender obtains an appraisal. A professional underwriter employed by the Direct Endorsement Lender performs a mortgage credit analysis to determine the borrower's ability and willingness to repay the mortgage debt in accordance with HUD rules. The Direct Endorsement Lender's underwriter makes the underwriting decision as to whether the mortgage may be approved for FHA insurance or not,

according to HUD rules. If the underwriter has decided that the mortgage may be approved for FHA insurance in accordance with HUD rules, the Direct Endorsement Lender closes the loan with the borrower. Thereafter, the Direct Endorsement Lender certifies that the mortgage qualifies for FHA insurance. FHA endorses the loan on the basis of the Direct Endorsement Lender's certification and provides the Direct Endorsement Lender with a mortgage insurance certificate.

82.     The Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. FHA endorses mortgages in reliance upon the Direct Endorsement Lender's certifications that the mortgages may be approved for FHA insurance. Direct Endorsement Lenders obligate HUD without independent HUD review.

83.     In the event that a borrower defaults on an FHA-insured mortgage, the holder of the mortgage is able to submit a claim to HUD for the costs associated with the defaulted mortgage.

84.     In the mortgage industry, the imprimatur of FHA mortgage insurance makes covered mortgages highly marketable for resale to investors both because such mortgages are expected to have met all HUD requirements and because they are insured by the full faith and credit of the United States.

### B.     *The False Claims Act (31 U.S.C. §3729 et seq.)*

85.     False Claims Act liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government. 31 U.S.C. §3729(a)(1)&(2).

86.     Under the False Claims Act, "knowing" and "knowingly" mean that a person, with respect to information:

      a.   Has actual knowledge of the information;

      b.   Acts in deliberate ignorance of the truth or falsity of the information; or

      c.   Acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. §3729(b).

87.     The False Claims Act is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a course of conduct that causes the Government to pay a false or fraudulent claim for money.

88.     Pursuant to 31 U.S.C. §3729(a)(3), any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

89.     Any person who violates the False Claims Act is liable for three times the damages caused to the Government plus civil penalties of not less than $5,000.00 nor greater than $11,000.00 per violation.

## V.     **FACTUAL ALLEGATIONS**

### A. *An Elaborate Scheme to Procure Fraudulent Conventional and Government-Insured Mortgages to Build a Hard-Money Lending Enterprise*

#### 1.   Overview of a Fraudulent Enterprise

90.     As previously noted, the subject case arises out of a failed attempt by at least two individuals to finance and develop their "hard money" lending business almost exclusively with fraudulent conventional Government-insured mortgages.

91.     Upon information and belief, throughout 2006 and 2007, the Enterprise used proceeds from fraudulent conventional and Government-insured mortgages to finance increasing numbers of loans and fraudulent transactions.

92.     Upon information and belief, the Enterprise's principals, Robert Svehlak and Neil Roseman, relied upon several scenarios and their exhaustive network of straw borrowers, straw buyers and shell land holding companies to obtain fraudulent conventional and Government-insured mortgages on properties within the Enterprise's secured portfolio.

93.     Upon information and belief, there were three lending entities in the Imagine Capital Enterprise: (1) Imagine Capital, Inc.; (2) LeadProbe, Inc.; and (3) ForeSite Investments, LLC.

94.     Upon information and belief, the Imagine Capital Enterprise Lending Entities would purport to underwrite short-term "hard-money" loans to borrowers seeking to "rehabilitate" investment properties in Baltimore City and other Maryland jurisdictions.[9]

95.     Upon information and belief, Figure 1 below shows an overview of the Imagine Capital Enterprise.

---

[9] Upon information and belief, in January 2012, Svehlak shifted the lending operations to ForeSite out of worry about possible liability for Imagine Capital arising out of potentially fraudulent past conduct.



FIGURE 1
THE IMAGINE CAPITAL LENDING ENTERPRISE

96. Upon information and belief, the Imagine Capital Enterprise generally consists of the entities shown in Figure 1 above and Table 1 below.

97. Upon information and belief, all estimates and figures presented in the tables and factual averments herein are approximate, and subject to modification.

| TABLE 1 | | | | |
|---|---|---|---|---|
| OVERVIEW OF ENTITIES IN THE IMAGINE CAPITAL ENTERPRISE | | | | |
| Line No. | Entity | Date Established | Principal(s) | Function |
| 1 | Imagine Capital, Inc. | 7/6/2006 | Svehlak, Roseman | Lending Entity |
| 2 | LeadProbe, Inc. | 7/2/2005 | Roseman, Svehlak | Lending Entity |
| 3 | ForeSite Investments, LLC | 1/6/2012 | Svehlak | Lending Entity |
| 4 | BSquared Real Estate Holdings, LLC | 6/5/2006 | Svehlak | Direct Land Holding Company |
| 5 | Castle Properties, LLC | 4/15/2009 | Svehlak | Direct Land Holding Company |
| 6 | Boomerang Properties, LLC | 4/23/2009 | Svehlak | Direct Land Holding Company |
| 7 | J.A.W. Enterprise, LLC | 2/4/2010 | Svehlak | Direct Land Holding Company |
| 8 | West Baltimore Treasures, LLC | 4/10/2012 | Svehlak | Direct Land Holding Company |
| 9 | 3814 Beehler Ave, LLC | 7/10/2007 | Svehlak | Straw Borrower Land Holding Company |
| 10 | Lex Real Estate Holdings, LLC | 1/3/2008 | Svehlak | Straw Borrower Land Holding Company |
| 11 | 1607 Gilmor, LLC | 9/3/2008 | Svehlak | Straw Borrower Land Holding Company |
| 12 | 3307 Henry G Parks, Jr., LLC | 9/3/2008 | Svehlak | Straw Borrower Land Holding Company |
| 13 | 4917 Palmer LLC | 9/3/2008 | Svehlak | Straw Borrower Land Holding Company |
| 14 | 3425 Park Heights Real Estate Holdings, LLC | 9/3/2008 | Svehlak | Straw Borrower Land Holding Company |
| 15 | 1615 Gilmor, LLC | 9/9/2008 | Svehlak | Straw Borrower Land Holding Company |
| 16 | 1724 Mckean, LLC | 9/29/2008 | Svehlak | Straw Borrower Land Holding Company |
| 17 | 1834 East North Avenue, LLC | 1/2/2009 | Svehlak | Straw Borrower Land Holding Company |
| 18 | 5214 Beaufort Avenue LLC | 1/12/2009 | Svehlak | Straw Borrower Land Holding Company |
| 19 | 1912 Etting St., LLC | 4/16/2009 | Svehlak | Straw Borrower Land Holding Company |

98.     Upon information and belief, since December 2005, each of the lending entities recorded transactions in the Land Records of Maryland evidencing purported "hard money loans" of an aggregate amount as reported in Table 2 on the following page.

| TABLE 2 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| OVERVIEW OF RECORDED LOANS ORIGINATED AND RELEASED BY ENTITY | | | | | | |
| Lending Entity | No. Loans Originated* | Total Prin. Amount Loaned* | No. Loans Released** | Total Prin. Amount Released** | Secured Properties Portfolio | Unreleased Properties |
| LeadProbe, Inc. | 9 | $520,836.00 | 7 | $410,500.00 | 9 | 2 |
| Imagine Capital, Inc. | 310 | $23,737,850.00 | 192 | $15,503,150.00 | 314 | 142[10] |
| ForeSite Investments, LLC | 4 | $421,000.00 | 0 | $0.00 | 4 | 4 |
| TOTAL | 323 | $24,679,686.00 | 199 | $15,913,650.00 | 327[11] | 206 |

99.    Beginning in July 2006, Svehlak and Roseman purported to offer their customers "hard money made easy" for the purposes of "acquiring" or "rehabilitating" residential investment properties in Maryland.

100.    Upon information and belief, Svehlak and Roseman did not actually have substantial capital of their own to invest in the Enterprise, and were entirely reliant on their ability to facilitate and procure fraudulent conventional or Government-insured mortgages, proceeds of which could be used to fund additional transactions.

101.    Upon information and belief, the great majority of these "construction escrow" loans were sham loans that served as cover to facilitate the procurement of a subsequent fraudulent conventional or Government-insured mortgage.

102.    Upon information and belief, a relatively small number of properties were actually repaired during their respective loan periods.

103.    Upon information and belief, a significantly greater number of properties had subsequent conventional or Government-insured mortgage than were actually repaired or improved during their respective loan periods.

---

[10] Upon information and belief, of these 142 properties reported approximately 27 had more than one Imagine Capital loan recorded, of which at least one loan still remains unreleased.

[11] Upon information and belief, the Enterprise was associated with approximately 328 properties, of which one of the properties was acquired by the Enterprise in a tax lien sale and resold directly to a purchaser with a conventional mortgage.

104.    Upon information and belief, a conventional or Government-insured mortgage succeeded an Imagine Capital Enterprise loan on approximately 192 of 328 properties in which the Enterprise had recorded a security interest, as reflected by the 192 mortgage transactions presented in Exhibit 1.

105.    Upon information and belief, the Imagine Capital Enterprise advertised that it offered four different types of loans on properties for investment purposes, including (i) acquisition-only loans; (ii) "acquisition with rehab" loans; (iii) Rehab-only loans; and (iv) cash out loans

106.    Upon information and belief, the largest portion of Imagine Capital Enterprise loans were so-called single-property "acquisition + rehab" loans (hereinafter "Type 2 loans") as shown in Table 3 whereby a single secured property was acquired by the borrower contemporaneously with the closing of the Imagine Capital loan transaction and in which the total stated principal amount of the Imagine Capital Enterprise loan was greater than or equal to 105% of the subject property acquisition price.

107.    Upon information and belief, a majority of the purported "loans" recorded by the Imagine Capital Enterprise were merely sham loans to straw borrowers and made for the purpose of facilitating the procurement of fraudulent conventional and Government-insured mortgages.

108.    Upon information and belief, the Enterprise included a network of several additional individuals and entities, including straw borrowers, straw buyers, and sham holding companies.

109.    Upon information and belief, Svehlak was the chief individual responsible for the Enterprise and generally signed all agreements and funded transactions.

110. Upon information and belief, Roseman was primarily responsible for promoting the Enterprise and for collections.

111. Upon information and belief, Svehlak served as the "Trustee" named on the Deed of Trust for all of the loans that were closed after the incorporation of Imagine Capital in July 2006.[12]

112. Upon information and belief, Svehlak had always insisted on serving as the "Trustee" for Imagine Capital's loan transactions to have maximum control and flexibility with regard to initiating foreclosure proceedings on any given property at any time.

113. Upon information and belief, Svehlak's wife, Beverly Svehlak was also an investor in the Enterprise.

114. Upon information and belief, on or about December 12, 2011, a UCC-1 financing statement, showing Svehlak and Beverly Svehlak as the secured parties, was recorded against the assets of Imagine Capital and assigned Acknowledgement Number 1000362002610790 by the Maryland State Department of Assessments and Taxation (SDAT).

115. Upon information and belief, also on December 12, 2011, a second UCC-1 financing statement was recorded against the assets of Imagine Capital. That statement was assigned Acknowledgement Number 1000362002610840 by SDAT and shows Neil Roseman and Amy Roseman as the secured parties.

116. Upon information and belief, the Enterprise began operations around December 2005, and the first conventional and Government-insured mortgages in Exhibit 1 began to appear in March 2006.

---

[12] Upon information and belief, prior to this time, the trustee was generally Ronald B. Katz, an attorney in Owings Mills, Maryland.

117.    Upon information and belief, in 2007, the Enterprise's transaction volume grew substantially, and in that year (the peak year), it purportedly closed 104 transactions, with a total aggregate purported loan principal amount of nearly $8 Million.

118.    Upon information and belief, in 2008, the Imagine Capital Enterprise started to see a decline in the number of transactions, purportedly closing some 68 loans representing a total aggregate purported loan principal amount of just over $5 Million.

119.    Upon information and belief, the Enterprise's inability to continue procuring large numbers of fraudulent conventional and Government-insured mortgages resulted in a significant decline throughout 2009 and 2010.

120.    Upon information and belief, the Enterprise's desperate need for money to service debt on past fraudulent conventional and Government-insured mortgages resulted in increasingly aggressive and fraudulent collection attempts against legitimate Imagine Capital Enterprise borrowers in the form of confessed judgment proceedings, foreclosure proceedings and other state court actions.

121.    Upon information and belief, the timing of aggressive collection efforts in the state court confessed judgment actions coincided with a significant decline in the ability of the Enterprise to procure fraudulent conventional and Government-insured mortgages because of tightening credit markets and increased scrutiny by mortgage lenders on real estate transactions.

122.    Upon information and belief, the breakdown of purported transactions recorded by the Enterprise by year is presented in Table 3 below.

123.    Upon information and belief, neither of the Enterprises principals, Svehlak or Roseman actually had nearly sufficient assets to originate the volume and amount of loans reported in Tables 2 and 3.

124.    Upon information and belief, the Enterprise primarily obtained its capital by reinvestment of proceeds garnered from fraudulent conventional and Government-insured mortgages.

| TABLE 3 RECORDED IMAGINE CAPITAL ENTERPRISE LOANS PURPORTEDLY ORIGINATED AND RELEASED BY YEAR | | | | |
|---|---|---|---|---|
| Year | No. of Loans Originated* | Total Prin. Amount Loaned* | No. of Loans Released** | Total Prin. Amount Released** |
| 2005 | 1 | $ 65,336.00 | 0 | $0.00 |
| 2006 | 40 | $2,656,750.00 | 4 | $160,000.00 |
| 2007 | 104 | $7,892,600.00 | 33 | $2,749,250.00 |
| 2008 | 68 | $5,077,500.00 | 44 | $3,507,100.00 |
| 2009 | 43 | $3,376,500.00 | 56 | $3,844,300.00 |
| 2010 | 25 | $2,361,500.00 | 30 | $3,102,000.00 |
| 2011 | 38 | $2,808,500.00 | 29 | $2,352,000.00 |
| 2012 | 4 | $ 423,000.00 | 3 | $199,000.00 |
| TOTAL | 323 | $24,661,686.00 | 199 | $15,913,650.00 |

125.    Upon information and belief, Table 4 on the following page provides a breakdown by type of the 323 loans purportedly consummated by the Imagine Capital Enterprise.

126.    Upon information and belief, a list of all purported Imagine Capital Enterprise Loan Transactions is presented in **EXHIBIT 2**, entitled *Summary Report of Loans by the Imagine Capital Enterprise*, and is incorporated by reference as if fully set forth herein.

127.    Upon information and belief, the list of loan type descriptions provided in **EXHIBIT 3**, substantially describes each and every type of recorded loan transactions presented in Table 4, and is incorporated by reference as if fully set forth herein.

| TABLE 4 | | | | | |
|---|---|---|---|---|---|
| **TOTAL IMAGINE CAPITAL ENTERPRISE LOANS PURPORTEDLY ORIGINATED AND RELEASED BY LOAN TYPE[13]** | | | | | |
| Loan Type | Short Name/ Description | Number of Loans Originated | Total Prin. Amount Originated | Number of Loans Released | Total Prin. Amount Released |
| 1 | Single-Property "Acquisition Only" Loan [(Loan Amt./Acq. Price) < 1.05] | 31 | $ 2,185,000.00 | 20 | $ 1,376,000.00 |
| 2 | Single-Property "Acquisition + Rehab" Loan [(Loan Amt./Acq. Price) ≥ 1.05] | 153 | $ 12,403,900.00 | 109 | $ 8,781,900.00 |
| 3 | Single-Property "Rehab Only" Loan [(Loan Amt./Est. Prop. Value) ≥ 1.05] | 49 | $ 3,452,000.00 | 30 | $ 2,046,000.00 |
| 4 | "Cash-Out + Rehab" Loan (Multi-Property Loan) | 10 | $ 1,098,000.00 | 7 | $ 906,000.00 |
| 5 | "Cash-Out + Single Property Acquisition" Loan (Multi-Property Loan) | 13 | $ 1,759,750.00 | 10 | $ 1,484,750.00 |
| 6 | "Multi-Property Simultaneous Acquisition" Loan | 4 | $ 285,500.00 | 1 | $ 82,500.00 |
| 7 | Additional Loan to Same Borrower on Previously-Secured Property | 11 | $ 548,000.00 | 7 | $ 237,000.00 |
| 8 | Imagine Capital Reassignment Loan on Previously-Secured Property | 18 | $ 1,205,000.00 | 3 | $ 226,000.00 |
| 9 | Multi-Shell Property Straw Borrower Land Holding Company Loan w/ Sub. Modification | 1 | $ 262,500.00 | 1 | $ 262,500.00 |
| 10 | Straw Borrower Land Holding Company Loan | 8 | $ 652,700.00 | 2 | $ 192,000.00 |
| 11 | Single-Property "Cash-Out" or "Rehab" Loan [(Loan Amt./Est. Prop. Value) < 1.05] | 19 | $ 677,336.00 | 9 | $ 319,000.00 |
| 12 | Special Multi-Property "Rehab-Only" Loan (Charter Property, LLC Loans) | 6 | $ 132,000.00 | 0 | $ 0.00 |
| | **TOTAL** | **323** | **$24,661,686.00** | **199** | **$15,913,650.00** |

---

[13] Figures in the table should be construed as approximate and based upon deeds of trust and releases recorded among the Land Records of Maryland.



Figure 2: Cumulative Aggregate Amounts of Loans Recorded and Released by the Imagine Capital Enterprise v. Time

128.    Upon information and belief, Figure 2 above depicts the approximate aggregate amount of purported loan transactions originated (blue line), released (red line), and predicted to be released (green line) between 2005 and 2012. The total value of loans originated (blue line) is calculated based on the date in recorded Deeds of Trust in the Land Records of Maryland. The total value of loans released (red line) is calculated based on the date in recorded Releases or Certificates of Satisfaction in the Land Records of Maryland. The total value of loans predicted to be released is based on purported final repayment deadlines in the Deeds of Trust.[14]

---

[14] As shown in Exhibit 2, the purported term for the large majority of Imagine Capital Enterprise loans was approximately 180 days. Upon information and belief, the average time from the closing date of an

129.    Upon information and belief, if documents recorded in the Land Records of Maryland actually memorialized legitimate loan transactions, approximately 33% to 40% of the loans would now be in default based upon the recorded releases and number of releases that are predicted to be recorded.

130.    Upon information and belief, the Enterprise was associated with 328 residential real properties in Baltimore City and other Maryland jurisdictions as shown in Table 5 below. A base list of subject properties is presented in **EXHIBIT 4**, and is incorporated by reference as if fully set forth herein.

| TABLE 5 | |
|---|---|
| **IMAGINE CAPITAL ENTERPRISE SECURED** | |
| **PROPERTIES BY JURISDICTION** | |
| **Jurisdiction** | **No. of Secured Prop.** |
| Anne Arundel | 6 |
| Baltimore Co. | 12 |
| Baltimore City | 277 |
| Calvert | 1 |
| Carroll | 2 |
| Cecil | 1 |
| Harford | 2 |
| Howard | 2 |
| Kent | 1 |
| Montgomery | 6 |
| Prince George's | 16 |
| St. Mary's | 1 |
| Washington | 1 |
| **TOTAL** | **328** |

---

Imagine Capital Enterprise loan to the closing date of a subsequent Government-insured or conventional mortgage was approximately 220 days.



**Figure 3: Cumulative Aggregate Amount of Conv. & Gov't-Ins. Mortgages on Subject Properties vs. Time**

### 2. Imagine Capital's Loans Closely Track Conventional and Gov't-Insured Mortgages

131.    Upon information and belief, of the 328 properties noted in on the previous page, approximately 192 properties had a conventional or Government-insured mortgage subsequent to an Imagine Capital loan.15  Figure 3 above shows the cumulative aggregate amount of conventional and Government-insured mortgages on those 192 properties with (1) the orange (top) line representing the aggregate amount over time of all conventional and Government-insured mortgages listed in Exhibit 1; (2) the purple (middle) line representing the aggregate amount over time of mortgages that are moderately-likely to have been fraudulent ("the

---

[15] Exhibit 1 presents the list of the subject conventional or Government-insured mortgages recorded on properties subsequent to an Imagine Capital loan transaction.

Moderate Propensity Mortgages"); and (3) the brown (bottom) line representing mortgages that are rated as highly-likely to have been fraudulent ("the High Propensity Mortgages").

132. Upon information and belief, an aggregate total of slightly more than $25 Million in conventional and Government-insured mortgages were obtained from banks and other legitimate lending sources subsequent to an Imagine Capital loan as depicted in Figure 3 on the previous page.[16]

133. Upon information and belief, to date, the aggregate principal amount of all fraudulent mortgages that are presented in Exhibit 1 is between $12 Million and $18.5 Million as shown in Figure 3 above.

134. Upon information and belief, of the 192 mortgages reported in Exhibit 1, 59 of the mortgages were Government-insured mortgages with a cumulative aggregate amount of slightly more than $9 Million.

135. Upon information and belief, the cumulative aggregate amount of conventional mortgages in Exhibit 1 is slightly greater than $15 Million.

136. Upon information and belief, Figure 4 on the following page depicts (1) the cumulative aggregate amount of all 192 subject mortgages shown in Exhibit 1 over time (top, orange line); (2) the cumulative aggregate amount of the 133 conventional mortgages over time (middle, blue line); and (3) the cumulative aggreate amount of the 59 Government-insured mortgages over time (bottom, red line).

---

[16] The Imagine Capital Enterprise purportedly loaned over $24 Million in approximately 323 transactions and recorded security interests in 328 properties between 2005 and 2012. Subsequent conventional or Government-insured mortgages, which in the aggregate represented approximately $25 Million in mortgage transactions, were recorded by legitimate institutions on approximately 192 of the 328 properties. It is estimated that as many as 148 of those conventional and Government-insured mortgages (approx. aggregate total of $18 Million) were fraudulent, including transactions with a fraud rating of 2, 3, or 4 in Exhibit 1.



**Figure 4: Cumulative Aggregate Principal Amount of all Subject Mortgages vs. Time**

137.    Upon information and belief, Figure 4 above generally shows that overall, the ability of the Imagine Capital Enterprise to procure fraudulent conventional and Government-insured mortgages started to decline in 2008.

138.    Upon information and belief, the number of new Government-insured mortgages increased slightly following the decline in the number of new conventional mortgages.

139.    Upon information and belief, tightening standards for issuing new conventional and Government-insured resulted in a steady decline in the number of new fraudulent conventional and Government-insured mortgages that could be procured by the Enterprise beginning at point in 2008.



Figure 5: Cumulative Aggregate Amount of Government-Insured Mortgages by Fraud Propensity vs. Time

140.    Upon information and belief, Figure 5 above generally depicts the cumulative aggregate amount over time of (1) the 59 Government-insured mortgages shown in Exhibit 1 (top, brown line); (2) the high and moderate-fraud propensity Government-insured mortgages (middle, purple line); and (3) the high-fraud propensity Government-insured mortgages (bottom, green line).

141.    Upon information and belief, the cumulative aggregate amount of Imagine Capital loans recorded among the Land Records of Maryland closely tracked the cumulative aggregate amount of Government-insured and conventional mortgages as depicted in Figure 6 on the following page.



**Figure 6: Cumulative Aggregate Amounts of Purported Imagine Capital Loans and Conventional & Gov't.-Insured Mortgages on Subject Properties vs. Time**

142. Upon information and belief, Figure 6 above depicts the approximate cumulative aggregate principal amount over time of (1) the 323 Imagine Capital Enterprise Loans that were purportedly originated; and (2) the 192 conventional and Government-insured mortgages issued on the 192 different properties presented in Exhibit 1.

143. Upon information and belief, the decline in the ability of the Enterprise to procure fraudulent conventional and Government-insured mortgages made it increasingly-difficult for the Enterprise to service debt on older fraudulent conventional and Government-insured mortgages, and was a primary reason that Svehlak and his wife, Beverly Svehlak

obtained a $1,000,000 mortgage on their previously-unencumbered Arnold, Maryland residence in April 2008.[17]

### 3. Relatively Few Properties Actually Improved Despite a Large Number of Cover Loans with a Purported "Rehabilitation" Component and Unjustifiably High Loan Principal Amounts

144.    Upon information and belief, the cover story for the sham loans was that they were for "rehabilitation" or repair of the subject properties.

145.    Upon information and belief, relatively few properties were actually repaired or rehabilitated during their respective loan periods.

146.    Upon information and belief, no real "construction escrow" or "repair escrow" accounts were ever actually established or funded, but rather were fictitious accounting entries on the books of Imagine Capital.[18]

147.    Upon information and belief, most of the "construction escrow" or "rehabilitation" loans were entirely shams.[19]

148.    Upon information and belief, the principal amount of the sham loans was selected such that when added to the acquisition price of a given property it would approximate the amount of a fraudulent mortgage that could be obtained.

---

[17] *See* Land Records of Anne Arundel County, RPD 20130/44.

[18] In some cases, Imagine Capital may have disbursed proceeds as purported "construction escrow" account draws, but they did not really come from real or legitimate escrow accounts.

[19] Upon information and belief, in many cases, it is believed that the purported Imagine Capital borrower was a straw borrower and agent of Imagine Capital. In other cases, such as that of the Relator, the borrower was legitimate, but did not actually know that a legitimate escrow never really existed. The failure to actually fund a "construction escrow" as promised can rightfully be called "the Phantom Escrow Account Lending Scam." The Phantom Escrow Account Lending Scam could be used to deceive unwitting borrowers into signing agreements in favor of the Enterprise. It may also be used to deceive legitimate financial institutions with regard to justifying a past loan amount.

149. Upon information and belief, the general formula for predicting the amount of a conventional or Government-insured mortgage that would be sought on a given property is:

**Mort. Amt. = Property Acquisition Price + Stated Imagine Capital Loan Amt.,**

In the formula above, <u>Mort. Amt</u>. is the amount of the conventional or Government-insured mortgage that is obtained on the property, <u>Prop. Acq. Price</u> is the acquisition price of the subject property and <u>Stated Imagine Capital Loan Amount</u> is the purported amount of the Imagine Capital Enterprise loan on the property.

150. Upon information and belief, in many cases, the Imagine Capital Enterprise would engage a straw borrower or fake guarantor to execute sham loan documents in favor of the Enterprise.

151. Upon information and belief, and as depicted in Table 4 on page 30, the greatest number of transactions involved single-property "acquisition + rehab" loans (hereinafter "Type 2 Loans") in which one secured property served as the collateral for the loan and where the property was acquired by the Imagine Capital borrower contemporaneously with the loan closing.

152. Upon information and belief, a large number of the Type 2 Loans were sham loans to straw borrowers.

153. Upon information and belief, Imagine Capital purportedly consummated approximately 153 Type 2 Loans on the same number of secured properties.

154. Upon information and belief, in each Type 2 Loan Transaction, the purported Imagine Capital loan amount was greater than or equal to 105% of the subject property acquisition price, and the acquisition of the property was contemporaneous with the loan closing.

155. Upon information and belief, the average Imagine Capital purported loan principal amount for Type 2 Loan Transactions was approximately 160% of the secured

property's acquisition price notwithstanding the fact that in each of these transactions the secured property served as the only collateral for the purported loan and the acquisition of the property was contemporaneous with the loan closing.

156.    Upon information and belief, no permits were issued for at least half of the secured properties that served as the collateral for the Type 2 loan transactions.

157.    Upon information and belief, irrespective of permits issued, no significant work was performed during the relevant loan period (defined as the period between the loan closing date and loan due date) on the subject properties for at least 75% to 90% of the secured properties that served as the collateral for the Type 2 loan transactions.

158.    Upon information and belief, the great majority of Type 2 loan transactions were followed by a conventional or Government-insured mortgage, without regard for whether a property had actually been improved or was inhabitable at the time the subsequent mortgage was issued.

159.    Upon information and belief, Figure 7 on the following page shows a breakdown by number of permits during the respective loan period of the 130 properties in Baltimore City that purportedly served as collateral for a Type 2 Imagine Capital loan.



**FIGURE 7**

NUMBER OF BALTIMORE CITY PROPERTIES HAVING THE SPECIFIED NUMBER OF PERMITS
DURING ITS RESPECTIVE IMAGINE CAPITAL ENTERPRISE TYPE 2 LOAN PERIOD

5 or More Permits,
14 Properties
(10.77%)

4 Permits,
10 Properties
(7.70%)

3 Permits,
7 Properties,
(5.38%)

2 Permits,
7 Properties
(5.38%)

1 Permit,
28 Properties
(21.54%)

No Permits,
64 Properties,
(49.23%)

160.     Upon information and belief, of the 130 properties that were the subject of

Type 2 Imagine Capital Loan Transactions in Baltimore City, approximately 91 had a

subsequent conventional or Government-insured mortgage. A list of the properties

purportedly serving as collateral for an Imagine Capital Type 2 Loan Transaction is presented

in **EXHIBIT 4,** entitled *Summary Report of Subject Property Permit Report for Baltimore*

*City Single-Property "Acquisition + Rehab" Loans with Subsequent Mortgage Information on*

*Subject Properties.* Properties with subsequent conventional or Government-insured

mortgages are highlighted in accordance with their estimated fraud rating.[20]

---

[20] Estimates of the fraud propensity for each subject mortgage transaction are provided in Exhibit 1.

161. Upon information and belief, of the 91 properties in Baltimore City with Imagine Capital Type 2 Loans that were followed by a conventional or Government-insured mortgage, approximately 45 of those mortgages (or 50%) have been the subject of a foreclosure or default proceeding by the mortgage lender.

162. Upon information and belief, of those properties in Baltimore City that are the subject of a completed foreclosure action on a conventional or Government-insured mortgage that followed a purported Imagine Capital Type 2 Loan, the resale price of the properties indicates that they were little more than shells for which fraudulent mortgages were procured.[21]

163. Upon information and belief, the Imagine Capital never disbursed money for repairs to subject properties unless the value of the property would actually support the disbursement.

164. Upon information and belief, the Imagine Capital Enterprise even advertised on its own website that it did not disburse money for repairs to subject properties in advance.

165. Upon information and belief, the Imagine Capital Enterprise advertised that it generally only loaned 65% of a secured property's After Repair Value (ARV).

166. Upon information and belief, Table 6 on the following page presents approximate summary data pertaining to the Imagine Capital Type 2 Loans on properties in Baltimore City.

---

[21] *See e.g.*, Exhibit 1, Case Ref. No. 37.

| TABLE 6 | |
|---|---|
| **SUMMARY STATISTICS FOR IMAGINE CAPITAL SINGLE-PROPERTY "ACQUISITION + REHAB" (TYPE 2) LOANS ON PROPERTIES IN BALTIMORE CITY** | |
| **Metric** | **Value** |
| Frequency of Type 2 Imagine Capital Loans on Properties in Baltimore City (*i.e.*, the entire population of this summary report) | 130 |
| Average (SD) Subject Property Acquisition Price [Median] (n=130) {Min, Max} | $44,463.78 ($25,014.85) [$39,950.00] {$564.00, $131,250.00} |
| Average (SD) Imagine Capital Type 2 Loan Amount [Median] (n=130) {Min, Max} | $ 71,060.77 ($28,903.83) [$65,000.00] {$18,000.00, $171,000.00} |
| Average (SD) LTV Ratio for Imagine Capital Type 2 Loans [Median] (n=130) {Min, Max} | 2.043 (1.237) [1.607] {1.058, 92.199} |
| Average (SD) "Repair Escrow" (Loan Excess) [Median] (n=130) {Min, Max} | $28,119.81 ($19,101.66) [$24,000.00] {$3,000.00, $95,000.00} |
| Average (SD) Subject Property Assessed Value [Median] (n=130) {Min, Max} | $65,545.08 ($54,415.07) [$48,050.00] {$3,000.00, $254,660.00} |
| Average (SD) Imagine Capital Loan Period (days) [Median] (n=130) {Min, Max} | 197 (18) days [195 days] {143 days, 299 days} |
| Frequency of Secured Properties with no Permits [1 or 2 permits] during Respective Loan Period (*i.e.*, Interval between the Loan Closing Date and Loan Due Dates) | 65 (50.00%)   [34 (26.15%)] |
| Frequency of Secured Properties with no Permits [1 or 2 permits] since the Relevant Imagine Capital Loan Closing Date (*i.e.*, Interval between the Loan Closing Date and the Present) | 41 (31.54%)   [42 (32.31%)] |
| Frequency of Secured Properties with no Permits [1 or 2 permits] during any Interval (*i.e.*, Interval between January 1, 2005 and the Present) | 37 (28.46%)   [43 (33.01%)] |
| Frequency of Baltimore City Secured Properties with an Imagine Capital Type 2 Loan followed by Conv. or Gov't.-Insured Mortgage | 91 |
| Average (SD) Principal Amount of Subsequent Conventional or Government-Insured Mortgage Following Type 2 Loan [Median] (n=91) {Min, Max} | $105,355.47 ($40,126.26) [$100,000.00] {$20,000.00, $237,511.00} |
| Frequency (%) of Baltimore City "Recycled" Properties with a Subsequent Conv. or Gov't-Insured Mortgage in Foreclosure[22] | 45 |

167.    Upon information and belief, the average purported principal amount of an Imagine Capital Type 2 loan was some 160% to 200% of the secured property acquisition

---

[22] The mortgages that have been the subject of a foreclosure proceeding can be seen in Exhibit 1.

price, notwithstanding the fact that the properties in such transactions were acquired contemporaneously with the purported Imagine Capital Enterprise loan closing and that the properties were the only collateral for the specific loan.

168.    Upon information and belief, a large number of conventional and Government-insured mortgages following Imagine Capital purported Type 2 Loan Transactions were fraudulent.

169.    Upon information and belief, many properties for which on fraudulent conventional or Government-insured mortgage could not be obtained were never repaired, allowed to become the subject of a tax foreclosure proceeding and/or abandoned notwithstanding the exorbitantly high loan principal amounts that the Enterprise had recorded on the properties.

170.    Upon information and belief, the property at 3425 Park Heights Ave., Baltimore, MD 21215 (hereinafter "the Park Heights Ave. Property") is one such prime example of an abandoned property upon which the Imagine Capital Enterprise recorded sham loans.

171.    Upon information and belief, notwithstanding the $173,000.00 that the Enterprise claimed to have loaned on the Park Heights Ave. Property, it is merely a shell property, the assessed value of which is $3,000.00.[23]

172.    Upon information and belief, the Park Heights Ave. Property was abandoned and noted in violation by the City of Baltimore at some time in 2008.

173.    Upon information and belief, notwithstanding the large claims that Imagine Capital had made regarding loaning money on the Park Heights Ave. Property, in or about December 2011, the decrypt condition of the property ultimately led the City of Baltimore to

---

[23] *See* Exhibit 4, Prop. Ref. No. 209. *See also* Exhibit 2, Loan Ref. No. 72 and Loan Ref. No. 215.

commence abandonment of property proceedings against the Enterprise on the Park Heights Ave. Property.[24]

174.   Upon information and belief, the entity which purportedly owned the Park Heights Ave. Property, PHREH, one of the Imagine Capital Enterprise Straw Borrower Land Holding Companies.[25]

175.   Upon information and belief, on or about January 23, 2009, the Imagine Capital Enterprise purported to execute a sham loan transaction with PHREH.

176.   Upon information and belief, the Imagine Capital Enterprise purported to loan some $173,000.00 on the Park Heights Ave. Property.

### 4.   Sham Loans to Straw Borrower Land Holding Companies Facilitate Fraudulent Mortgages – Lex Real Estate Holdings, LLC

177.   Upon information and belief, Svehlak and the Imagine Capital Enterprise regularly used or attempted to use Straw Borrower Land Holding Companies to facilitate the procurement of fraudulent mortgages.

178.   Upon information and belief, Svehlak established the eleven Straw Borrower Land Holding Companies as shown in Table 1, and would attempt to use names as to make the companies appear as if they belonged to Imagine Capital borrowers.

179.   Table 7 and Table 8 below present by aggregate principal amount and number of loans, respectively, the top 20 Imagine Capital Enterprise loan guarantors.

---

[24] *See e.g.,* Mayor and City Council of Baltimore City v. 3425 Park Heights Real Estate Holdings, LLC *et al.,* Case No. 0101-0033784-2011, Balt. City Dist. Ct., filed December 20, 2011. Upon information and belief, judgment was entered in favor of the City of Baltimore on or about February 8, 2012.

[25] Upon information and belief, on or about January 20, 2012, shortly after receiving notice regarding the condition of the Park Heights Ave. Property, Svehlak sent a notice to the Maryland Department of Assessments and Taxation (SDAT), resigning as the resident agent of the Straw Borrower Land Holding Company and claiming that he was no longer affiliated with the entity.

| | TABLE 7 | | | |
|---|---|---|---|---|
| | TOP 20 PRIMARY GUARANTORS BY AGGREGATE PRINCIPAL AMOUNT IMAGINE CAPITAL LOANS | | | |
| Rank | Guarantor | Associated Entity(ies) on Imagine Capital Loan Documents | No. of Loans | Aggr. Prin. Amt. Imagine Capital Loans Guaranteed |
| 1 | ADEMILUYI, OLUSEYI | APEX INVESTMENTS LLC | 5 | $ 930,000.00 |
| 2 | UMPHERY, MARCEL T. | 4720 YORK RD, LLC 761 E 36TH STREET, LLC MUMJ DEVELOPMENT, LLC | 9 | $ 810,000.00 |
| 3 | LEONCE, SEAN G. | CHASE FINE HOMES, LLC SGL HOLDINGS LLC | 4 | $ 713,000.00 |
| 4 | THOMAS, MARCUS D. | | 7 | $ 703,000.00 |
| 5 | PAMPHILIS, ALEXANDER E. | 3814 BEEHLER AVE, LLC LEX INVESTORS, LLC LEX REAL ESTATE HOLDINGS, LLC | 6 | $ 600,500.00 |
| 6 | GREENWOOD, PENNY C. | CANYON RIVER, LLC D AND P INVEST, LLC | 8 | $ 480,000.00 |
| 7 | BROWN, KERRON P. | KB INVESTMENTS, LLC | 8 | $ 478,000.00 |
| 8 | ROBINSON, ANTONIO M. | | 7 | $ 424,000.00 |
| 9 | THOMAS, AMANDA D. | | 5 | $ 408,000.00 |
| 10 | ROZENCWAIG, CAROL S. | 1249 WINSTON AVE LLC 1255 CEDARCROFT LLC | 3 | $ 402,000.00 |
| 11 | BRASH, SHARON L. | BEE HOME, LLC | 2 | $ 390,000.00 |
| 12 | FLORA, DAVID J. | OHIO INVESTMENTS, LLC | 11 | $ 384,000.00 |
| 13 | BERGEY, HARRY W. | HWB 134 N LUZERNE AVE, LLC | 2 | $ 340,000.00 |
| 14 | WINGER, JASON A. | | 1 | $ 315,000.00 |
| 15 | YOUNG, MICHAEL M. | 616 SOUTH BELNORD LLC MTL ENTERPRISES, LLC | 2 | $ 313,000.00 |
| 16 | RILEY, REGINALD N. JR. | | 2 | $ 309,000.00 |
| 17 | BUTLER, KEVIN T. | BUTLER MANAGEMENT, LLC JOINT VENTURE PROPERTIES, LLC URBAN RENEWAL PROJECT, LLC | 4 | $ 290,000.00 |
| 18 | WILLABUS, ANTONIO K. | WILLCO MANAGEMENT HOLDINGS, LLC | 3 | $ 279,000.00 |
| 19 | RONALDSON, STUART A. | AMERICAN LENDING LLC | 4 | $ 264,000.00 |
| 20 | ROZENCWAIG, MAURICE E. | COMEBACK ONE, LLC | 2 | $ 257,000.00 |
| TOTAL | | | 97 | $ 9,089,500.00 |

| | **TABLE 8** | | | |
|---|---|---|---|---|
| | **TOP 20 PRIMARY GUARANTORS BY TOTAL NUMBER OF LOANS** | | | |
| **Rank** | **Guarantor** | **Associated Entity(ies) on Imagine Capital Recorded Loan Documents** | **Aggr. Prin. Amt. Imagine Capital Loans Guaranteed** | **No. of Loans** |
| 1 | FLORA, DAVID J. | OHIO INVESTMENTS, LLC | $ 384,000.00 | 11 |
| 2 | UMPHERY, MARCEL T. | 4720 YORK RD, LLC<br>761 E 36TH STREET, LLC<br>MUMJ DEVELOPMENT, LLC | $ 810,000.00 | 9 |
| 3 | GREENWOOD, PENNY C. | CANYON RIVER, LLC<br>D AND P INVEST, LLC | $ 480,000.00 | 8 |
| 4 | BROWN, KERRON P. | KB INVESTMENTS, LLC | $ 478,000.00 | 8 |
| 5 | THOMAS, MARCUS D. | | $ 703,000.00 | 7 |
| 6 | ROBINSON, ANTONIO M. | | $ 424,000.00 | 7 |
| 7 | PAMPHILIS, ALEXANDER E. | 3814 BEEHLER AVE, LLC<br>LEX INVESTORS, LLC<br>LEX REAL ESTATE HOLDINGS, LLC | $ 600,500.00 | 6 |
| 8 | SHERMAN, SETH M. | CHARTER PROPERTY, LLC | $ 132,000.00 | 6 |
| 9 | ADEMILUYI, OLUSEYI | APEX INVESTMENTS LLC | $ 930,000.00 | 5 |
| 10 | THOMAS, AMANDA D. | | $ 408,000.00 | 5 |
| 11 | LIDZ, DAVID A. | HALLOW'D HOUSE, LLC | $ 211,000.00 | 5 |
| 12 | LEONCE, SEAN G. | CHASE FINE HOMES, LLC<br>SGL HOLDINGS LLC | $ 713,000.00 | 4 |
| 13 | BUTLER, KEVIN T. | BUTLER MANAGEMENT, LLC<br>JOINT VENTURE PROPERTIES, LLC<br>URBAN RENEWAL PROJECT, LLC | $ 290,000.00 | 4 |
| 14 | RONALDSON, STUART A. | AMERICAN LENDING LLC | $ 264,000.00 | 4 |
| 15 | ROZENCWAIG, CAROL S. | 1249 WINSTON AVE LLC<br>1255 CEDARCROFT LLC | $ 402,000.00 | 3 |
| 16 | WILLABUS, ANTONIO K. | WILLCO MANAGEMENT HOLDINGS, LLC | $ 279,000.00 | 3 |
| 17 | KING, WILLIAM H. V | | $ 255,000.00 | 3 |
| 18 | CACEDA-HUAMAN, JUAN A. | | $ 228,000.00 | 3 |
| 19 | MILLER, DOLORES R. | 1311 NORTH FULTON LLC | $ 213,000.00 | 3 |
| 20 | COVINGTON, PAUL D. | 1724 MCKEAN, LLC<br>FORELSE PROPERTIES, LLC | $ 210,500.00 | 3 |
| **TOTAL** | | | **$ 8,415,000.00** | **107** |

180.    Upon information and belief, the Type 9 and Type 10 Loans listed in Table 4

on page 30 were entirely fraudulent and made for the purposes of obtaining conventional and

Government-insured mortgages on shell properties.

181.     Upon information and belief, the Type 9 and Type 10 Loans were all made to the Straw Borrower Land Holding Companies as shown in Table 9 below.

| TABLE 9 | | | | | | |
|---|---|---|---|---|---|---|
| EXAMPLES OF SUSPECTED SHAM LOANS BY IMAGINE CAPITAL TO THE STRAW BORROWER LAND HOLDING COMPANIES | | | | | | |
| Loan Ref. No. (Ex. 3) | Deed Ref. (L.R. Balt. City) | Loan Closing Date | Stated Principal Amount | No. Prop. | Straw Borrower Land Holding Company (Purported Borrower) | Suspected Straw Borrower (Purported Guarantor) |
| 102 | FMC 9862/26 | 8/21/2007 | $69,000.00 | 1 | 3814 Beehler, LLC | Pamphilis, Alexander |
| 149 | FMC 10325/214 | 1/4/2008 | $262,500.00 | 3 (9)* | Lex Real Estate Holdings, LLC | Pamphilis, Alexander |
| 196 | FMC 11056/525 | 10/6/2008 | $69,000.00 | 1 | 4917 Palmer LLC | Jennings, Wayne A |
| 215 | FMC 11367/101 | 1/23/2009 | $96,000.00 | 1 | 3425 Park Heights Real Estate Holdings, LLC | Bartz, Michael A. |
| 223 | FMC 11367/282 | 2/6/2009 | $91,000.00 | 1 | 5214 Beaufort Avenue LLC | Pezold, Jonathan E. |
| 251 | FMC 12226/374 | 11/24/2009 | $123,000.00 | 2 | 1607 Gilmor, LLC; 1615 Gilmor, LLC | Koroma, Kaitibie J. |
| 253 | FMC 12226/394 | 12/1/2009 | $48,000.00 | 1 | 1724 McKean, LLC | Covington, Paul D. |
| 254 | FMC 12272/349 | 12/9/2009 | $111,700.00 | 1 | 3307 Henry G Parks, Jr., LLC | Ariyibi, Zainab |
| 270 | FMC 12658/214 | 5/20/2010 | $45,000.00 | 1 | 1834 East North Avenue, LLC | Murphy, Teresa |

182.     Upon information and belief, Lex Real Estate Holdings, LLC (LREH) was one of the Straw Borrower Land Holding Companies.

183.     Upon information and belief, LREH was established by Svehlak on or about January 3, 2008 to procure fraudulent mortgages on several shell properties in Baltimore City.

184.     Upon information and belief, through LREH, the Enterprise procured more than $700,000.00 in fraudulent conventional mortgages from Slavie Federal Savings Bank, Bank of America, N.A. and Washington Mutual Bank, N.A.

185.     On January 4, 2008, three shell properties (top three properties; highlighted yellow in Table 10 on the pages below), which were already associated with the Imagine Capital Enterprise or one of its borrowers were transferred to LREH.[26]

---

[26] *See* Exhibit 1, Loan Ref. No. 149.  See also L.R. Balt. City, FMC 10325/214.

186.    Upon information and belief, the three properties served as the security for a sham loan by Imagine Capital to LREH in the purported amount of $262,500.00.

187.    Upon information and belief, as fraudulent mortgages were obtained on the properties, Imagine Capital would execute and record releases thereon, but some time later, reaffirm its security interest in the properties by execution and recording of a sham Deed of Trust Modification Agreement between Imagine Capital and the Straw Borrower Land Holding Company.[27]

188.    Upon information and belief, on or about November 25, 2008, Imagine Capital recorded a sham modification agreement in the Land Records of Baltimore City at Liber FMC 11214, Folio 61 (hereinafter "the November 25th Sham Modification Agreement"), which purported to add additional collateral for the sham loan to the LREH.

189.    Upon information and belief, the sham modification agreement was recorded in an attempt to extract additional money from the mortgage lender or a title insurance company in exchange for another release from Imagine Capital.

190.    Upon information and belief, a second sham modification agreement was also executed on or about December 20, 2008 and subsequently recorded in the Land Records of Baltimore City at Liber FMC 11313, Folio 468, in order to reaffirm a security interest that had been released by Imagine Capital on or about December 1, 2008 following the closing of a fraudulent mortgage from Slavie Federal Savings Bank on or about November 25, 2008.[28]

191.    Upon information and belief, in the November 25th Sham Modification Agreement, Imagine Capital also purported to add six additional properties as collateral for its sham loan to LREH.

---

[27] *See e.g.*, L.R. Balt. City, FMC 11214/61.
[28] *See*, Exhibit 1, Mort. Ref. No. 110.

192.     Upon information and belief, five of the six additional properties were then-serving as the collateral for fraudulent mortgages.

193.     Upon information and belief, some of those properties had served as the collateral for earlier sham loans by Imagine Capital.

194.     Upon information and belief, Alexander E. Pamphilis (hereinafter "Pamphilis") served as the fake guarantor for the sham loan to LREH and for other sham loans.[29]

195.     Upon information and belief, Table 10 on the following page provides details regarding all nine properties that ultimately served as collateral for the sham loan from Imagine Capital to LREH (Loan Ref. No. 149), with the three properties highlighted in yellow serving as the original collateral for the sham loan and the other properties being added as additional collateral through the November 25th Sham Modification Agreement.

196.     Upon information and belief Svehlak selected the LREH name to disguise his involvement with the entity and because Alexander Pamphilis, a fake guarantor for Imagine Capital, already had a company named Lex Investors, LLC.

---

[29] Upon information and belief, Pamphilis served as the fake guarantor for an earlier loan to 3814 Beehler, LLC, one of the other Straw Borrower Land Holding Companies. *See* Table 9 above.

**TABLE 10**

SUMMARY INFORMATION REGARDING SUBSEQUENT MORTGAGES AND DISPOSITIONS FOR PROPERTIES SECURING SHAM LOAN FROM IMAGINE CAPITAL TO LEX REAL ESTATE HOLDINGS, LLC

| Line No. | Subject Property Address | Mortgage Date (Ex. 2 Mort Ref. No.) | Mortgage Lender | Original Acquisition Price | Total IC Adj. Amount Purp. Loaned | Bank Mort. Amount | Sub. Disposition |
|---|---|---|---|---|---|---|---|
| 1 | 922 E. 41st St. Baltimore, MD 21218 (Prop. Ref. No. 14) | 11/25/2008 (Ref. No.110) | Slavie Federal Savings Bank | $55,000.00 | $ 59,166.67 | $ 95,000.00 | Foreclosed; transferred to bank; not yet resold |
| 2 | 805 Appleton St. Baltimore, MD 21217 (Prop. Ref. No. 22) | 8/19/2008 (Ref. No. 86) | Slavie Federal Savings Bank | $45,000.00 | $ 29,166.67 | $ 72,500.00 | Foreclosed; resold along with two other shell properties for $36,500.00 in May 2012 |
| 3 | 1517 N. Payson St. Baltimore, MD 21217 (Prop. Ref. No. 217) | 6/9/2008 (Ref. No. 80) | Slavie Federal Savings Bank | $50,000.00 | $ 29,166.67 | $ 72,000.00 | Foreclosed; transferred to bank; not yet resold |
| 4 | 2755 Tivoly Ave. Baltimore, MD 21218 (Prop. Ref. No. 265) | N/A | | $24,500.00 | $ 29,166.67 | | No mortgage; sold by Alexander Pamphilis for $6,000.00 on March 31, 2009 |
| 5 | 2718 Hugo Ave. Baltimore, MD 21218 (Prop. Ref. No. 140) | 8/29/2007 (Ref. No. 37) | Washington Mutual Bank, N.A. | $40,000.00 | $ 89,166.67 | $ 104,800.00 | Foreclosed by WaMu; resold for $5,500.00 on March 18, 2011 |
| 6 | 1127 Myrtle Ave. Baltimore, MD 21201 (Prop. Ref. No. 190) | 11/2/2007 (Ref. No. 51) | Bank of America, N.A. | $67,500.00 | $ 219,166.67 | $ 121,380.00 | Foreclosed; transferred to Fed Nat'l Mort. Assn; not yet resold |
| 7 | 3814 Beehler Ave. Baltimore, MD 21215 (Prop. Ref. No. 39) | 3/14/2008 (Ref. No. 67) | Bank of America, N.A. | $20,475.00 | $ 129,166.67 | $ 69,900.00 | In foreclosure; not yet transferred or resold |
| 8 | 1703 Montpelier St. Baltimore, MD 21218 (Prop. Ref. No. 186) | 1/31/2008 (Ref. No. 59) | Bank of America, N.A. | $52,000.00 | $ 84,166.67 | $ 90,900.00 | Foreclosed by BofA; resold for $11,000.00 on Feb. 11, 2011. |
| 9 | 2752 Fenwick Ave. Baltimore, MD 21218 (Prop. Ref. No. 108) | 3/4/2008 (Ref. No. 65) | Bank of America, N.A. | $20,000.00 | $ 80,166.67 | $ 86,400.00 | No subsequent activity recorded |

197.     Upon information and belief, as shown in Table 10, eight of the nine properties had subsequent conventional mortgages with principal amounts significantly higher than their original acquisition prices.

198.     Upon information and belief,  with the exception of two minor permits issued on the Montpelier St. Property (Line No. 8 in Table 10), no permits were issued on any of the properties evidencing work or improvements to the properties during any time period relevant to the subject transactions.  As seen from the three properties that have been resold after foreclosure, all of them are near worthless shell properties.

199.     Upon information and belief, Table 11 below shows the calculation of the total adjusted principal amount that Imagine Capital purportedly loaned on each of the properties listed in Table 10.

| TABLE 11 | | | | | | | |
|---|---|---|---|---|---|---|---|
| CALCULATION OF TOTAL ALLOCATED AMOUNT PURPORTEDLY LOANED BY IMAGINE CAPITAL FOR EACH OF THE PROPERTIES SECURING SHAM LOAN BY IMAGINE CAPITAL TO LEX REAL ESTATE HOLDINGS, LLC | | | | | | | |
| Line No. | Subject Property Address | No. IC Loans | IC Loan History Information [Loan Ref No. (Loan Type:NP) – Close Date] | IC Loan 1 Amount | IC Loan 2 Amount | IC Loan 3 Amount | Total IC Adj. Amount Purp. Loaned |
| 1 | 922 E. 41st St. Baltimore, MD 21218 | 2 | 54 (11:1) - 3/8/2007; 149 (9:9) - 1/4/2008 | $ 30,000.00 | $  29,166.67 | $           - | $  59,166.67 |
| 2 | 805 Appleton St. Baltimore, MD 21217 | 1 | 149 (9:9) - 1/4/2008 | $ 29,166.67 | $           - | $           - | $  29,166.67 |
| 3 | 1517 N. Payson St. Baltimore, MD  21217 | 1 | 149 (9:9) - 1/4/2008 | $ 29,166.67 | $           - | $           - | $  29,166.67 |
| 4 | 2755 Tivoly Ave. Baltimore, MD 21218 | 1 | 149 (9:9) - 1/4/2008 | $ 29,166.67 | $           - | $           - | $  29,166.67 |
| 5 | 2718 Hugo Ave. Baltimore, MD 21218 | 2 | 69 (2:1) - 5/3/2007; 149 (9:9) - 1/4/2008 | $ 60,000.00 | $  29,166.67 | $           - | $  89,166.67 |
| 6 | 1127 Myrtle Ave. Baltimore, MD 21201 | 3 | 25 (2:1) - 10/18/2006; 113 (8:1) - 10/15/2007; 149 (9:9) - 1/4/2008 | $ 87,000.00 | $ 103,000.00 | $ 29,166.67 | $ 219,166.67 |
| 7 | 3814 Beehler Ave. Baltimore, MD 21215 | 3 | 48 (3:1) - 2/5/2007; 102 (10:1) - 8/21/2007; 149 (9:9) - 1/4/2008 | $ 39,000.00 | $  61,000.00 | $ 29,166.67 | $ 129,166.67 |
| 8 | 1703 Montpelier St. Baltimore, MD 21218 | 2 | 120 (2:1) - 11/2/2007; 149 (9:9) - 1/4/2008 | $ 55,000.00 | $  29,166.67 | $           - | $  84,166.67 |
| 9 | 2752 Fenwick Ave. Baltimore, MD 21218 | 2 | 85 (2:1) - 6/13/2007; 149 (9:9) - 1/4/2008 | $ 51,000.00 | $  29,166.67 | $           - | $  80,166.67 |

5. A Series of Patterns Emerge for Using the Sham Loans to Faciliate the Procurement of Fraudulent Mortgages

200.    Upon information and belief, each of the 192 conventional and Government-insured mortgages presented in Exhibit 1, generally falls into one of ten schemes and patterns, all of which effectively involve a suspected sham loan from the Imagine Capital Enterprise to provide support for a subsequent fraudulent mortgage that is unsupported by the value of the subject property.

201.    Upon information and belief, Svehlak, Roseman and the Imagine Capital Defendants in dozens of cases that substantially follow or are similar to one or more of the factual schemes or scenarios set forth herein, Svehlak, Roseman and the Imagine Capital Defendants caused or resulted in the issuance of false and fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(A).

202.    Upon information and belief, Svehlak, Roseman and the Imagine Capital Defendants in dozens of cases that substantially follow or are similar to one or more of the factual schemes or scenarios set forth herein, Svehlak, Roseman and the Imagine Capital Defendants made false statements that resulted in the issuance of false and fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

203.    Upon information and belief, Svehlak, Roseman and the Imagine Capital Defendants in dozens of cases that substantially follow or are similar to one or more of the factual schemes or scenarios set forth herein, Svehlak, Roseman and the Imagine Capital Defendants made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States in violation of 31 U.S.C. §3729(a)(1)(G).

204. Upon information and belief, in dozens of cases that are substantially follow one or more of the factual scheme or scenarios set forth herein, Svehlak, Roseman and the Imagine Capital Defendants conspired to defraud the Government by causing the issuance of fraudulent Government-insured mortgages and caused false and fraudulent claims to be allowed and paid in violation of 31 U.S.C. §3729(a)(3).

### i. The Direct Borrower "Refinancing" Mortgage Scenario[30]

205. In the Direct Borrower "Refinancing" Mortgage Scenario, a sham loan in the name of a straw borrower or fake guarantor is recorded by the Imagine Capital Enterprise.

206. Upon information and belief, the sham loan, which greatly exceeds the actual value of the secured collateral, is subsequently "refinanced" with a conventional or Government-insured mortgage written in the name of the original Imagine Capital Enterprise borrower.

207. Upon information and belief, the Imagine Capital Enterprise is "repaid" with the proceeds from the closing of the conventional or Government-insured mortgage.

208. Upon information and belief, approximately 57 of the mortgage transactions presented in Exhibit 1 follow the Direct Borrower "Refinancing" Mortgage Scenario.

209. Upon information and belief, the scenario generally resulted in conventional bank mortgages.

210. Approximately 27 to 40 of the mortgages procured through the Direct Borrower Refinancing Mortgage Scenario were fraudulent.

---

[30] Transactions following the Direct Borrower "Refinancing" Mortgage Scenario have an "Overall Pattern" designation #1 in Exhibit 1.

211. Upon information and belief, the Direct Borrower "Refinancing" Mortgage Scenario accounted for approximately $5.5 Million of the conventional mortgages presented in Exhibit 1.

212. Upon information and belief, approximately $2.5 Million to $3.5 Million of the mortgages obtained in the Direct Borrower "Refinancing" Mortgage Scenario were fraudulent.

213. Upon information and belief, the value for many of the properties securing the "Refinancing" mortgages did not actually support the mortgage amount.

214. Upon information and belief, many of the loans that were "refinanced" were sham loans on shell properties to straw Imagine Capital borrowers.

215. Upon information and belief, many "Refinancing" conventional and Government-insured mortgages were obtained on properties that had not been improved.

ii. Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario[31]

216. Upon information and belief, in the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario, the original Imagine Capital Enterprise Borrower sells a property with an Imagine Capital loan to a "subsequent purchaser" in an apparent "arms-length" transaction. The transaction is financed with proceeds from a conventional or Government-mortgage obtained in the name of the "subsequent purchaser."

217. Upon information and belief, the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario was by far the most common pattern accounting

---

[31] Transactions following the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario have an "Overall Pattern" designation #2 in Exhibit 1.

for approximately 86 of the conventional and Government-insured mortgage cases presented in Exhibit 1, of which approximately 10 mortgages have already resulted in a foreclosure.

218.    Upon information and belief, approximately 29 to 66 of the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario were fraudulent, indicated at least in part, by the number of apparent shell properties that have been the subject of foreclosure actions.

219.    Upon information and belief, the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario accounted for approximately for approximately $13 Million of the total aggregate principal amount of conventional and Government-insured mortgages presented in Exhibit 1.

220.    Upon information and belief, approximately $5 Million to $9 Million of the mortgages procured through the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario were fraudulent.

221.    Upon information and belief, approximately 52 of the 86 mortgages following the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario, were Government-insured mortgages.

222.    Upon information and belief, the diagram above depicts the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario.

223.    Upon information and belief, the aggregate principal amount of the 52 Government-insured mortgages that fall into the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario was approximately $8.4 Million.

224.    Upon information and belief, the aggregate principal amount of fraudulent Government-insured mortgages obtained through the Direct Borrower Resale and

"Subsequent Purchaser" Acquisition Mortgage Scenario was approximately between $3 Million and $6 Million.

| Mort. Case Ref. No. (Ex. 1) | FHA Case No. | Mortgage Amount | Imagine Capital Purport. Amount Loaned | Original Acq. Price by First IC Borrower | Resale After Bank Forc. | Est. Loss to Government |
|---|---|---|---|---|---|---|
| TABLE 12 EXAMPLES OF SUSPECTED FRAUDULENT GOVERNMENT-INSURED MORTGAGES PROCURED THROUGH THE DIRECT BORROWER RESALE AND "SUBSEQUENT PURCHASER" ACQUISITION MORTGAGE SCENARIO | | | | | | |
| 11 | 241-7793108-703 | $ 115,710.00 | $ 72,000.00 | $ 50,000.00 | $ 25,500.00 | $ 106,750.00 |
| 44 | 241-7921715-703 | $ 128,981.00 | $ 70,000.00 | $ 65,000.00 | $ 30,001.00 | $ 110,499.00 |
| 104 | 241-8287372-703 | $ 122,970.00 | $ 65,000.00 | $ 50,000.00 | $ 25,000.00 | $ 169,500.00 |
| Grand Totals | | $367,661.00 | $207,000.00 | $165,000.00 | $80,501.00 | $386,749.00 |

225.     Upon information and belief, Table 12 above provides three examples of apparently fraudulent Government-insured mortgages following the pattern of the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario.

226.     Upon information and belief, in the fraudulent cases, the borrower who purported to resell the subject property to a "subsequent purchaser" was really a   straw borrower and agent of the Imagine Capital Enterprise.

227.     Table 13 on the following page below provides additional information, including the Direct Endorsement Lender, pertaining to the apparently fraudulent Government-insured mortgages presented in the table above.[32]

---

[32] Additional details about these cases and all of the mortgages that are the subject of this Complaint appear in Exhibit 1 with the corresponding "Mort. Case Ref. Number."

| TABLE 13 ADDITIONAL INFORMATION PERTAINING TO EXAMPLES OF SUSPECTED FRAUDULENT GOVERNMENT-INSURED MORTGAGES | | | | |
|---|---|---|---|---|
| Mort. Case Ref. No. (Ex. 1) | FHA Case No. | Subject Property Address | Direct Endorsement Lender | Imagine Capital Borrower (Seller to Mort. Borrower)[33] |
| 11 | 241-7793108-703 | 3103 Mareco Ave. Baltimore, MD 21213 | National City Bank | L J Investments, LLC |
| 44 | 241-7921715-703 | 617 Glenwood Ave. Baltimore, MD 21212 | First Home Mortgage Corporation | Katherine Ihourane |
| 104 | 241-8287372-703 | 3155 Lyndale Ave. Baltimore, MD 21213 | Bank of America | Throneroom Corporation |

*iii.* "New" Straw Borrower "Refinancing" Mortgage Scenario[34]

228. Upon information and belief, the "New" Straw Borrower "Refinancing" Mortgage Scenario is similar to the first scenario except that it involves at least two Imagine Capital borrowers, and the property is first conveyed to a "buyer" that is recruited or named by the Imagine Capital Enterprise.

229. Upon information and belief, the first borrower may actually be a legitimate "would-be borrower" of the Imagine Capital Enterprise whose loan for whatever reason is declared to be in "default."

230. Upon information and belief, the Imagine Capital Enterprise purports to provide the financing for the "sale" of the property to the new Imagine Capital Enterprise borrower with a new Imagine Capital Enterprise loan (these loans are hereafter referred to as "the Type 8 Imagine Capital Loans").

231. Upon information and belief, the new Type 8 Loan on the property may purport to be for an even greater amount that the original Imagine Capital loan on the property,

---

[33] Upon information and belief, the sellers of these properties were "straw borrowers" and agents of the Imagine Capital Enterprise.

[34] Transactions following the "New" Straw Borrower "Refinancing" Mortgage Scenario Mortgage Scenario have an "Overall Pattern" designation #3 in Exhibit 1.

notwithstanding the fact that the property may not have been improved at all during the first loan period.[35]

232.    Upon information and belief, in some cases, the purported transfer price of the subject property to the "New" Imagine Capital Enterprise Straw Borrower may be manipulated or inflated as to support or facilitate the procurement of a subsequent conventional or Government-insured mortgage of an even greater amount.

233.    In the "New" Straw Borrower "Refinancing" Mortgage Scenario, the second "borrower" who is the recipient of the secured property obtains a refinancing conventional or "Government-insured" mortgage on the property, which "repays" the sham loan from the Imagine Capital Enterprise.

234.    Upon information and belief, the "New" Straw Borrower "Refinancing" Mortgage Scenario accounted for approximately five of the conventional and Government-insured mortgage transactions presented in Exhibit 1.

*iv.*    New" Straw Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario[36]

235.    Upon information and belief, the "New" Straw Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario is similar to the second scenario except that it involves at least two Imagine Capital borrowers, and the property is first conveyed to a second Imagine Capital Enterprise "Straw Borrower" who subsequently resells the Property to a "subsequent purchaser" in an apparent arms-length transaction.

236.    Upon information and belief, the "New" Straw Borrower Resale and "Subsequent Purchaser" Acquisition Scenario is depicted in the diagram above.

---

[35] For a number of reasons, Imagine Capital likely did not actually disburse the claimed loan amount.
[36] Transactions following the "New" Straw Borrower Resale and Subsequent Purchaser" Acquisition Mortgage Scenario have an "Overall Pattern" designation #4 in Exhibit 1.

237.    The transaction is funded by a conventional or Government-insured mortgage that is obtained in the name of the "subsequent purchaser."

238.    The first borrower may actually be a legitimate "would-be borrower" of the Imagine Capital Enterprise whose loan for whatever reason is declared to be in "default."

239.    The Imagine Capital Enterprise purports to provide the financing for the "sale" of the property to the new Imagine Capital Enterprise borrower with a new "Type 8" Imagine Capital Enterprise loan.

240.    The new Type 8 Loan on the property may purport to be for an even greater amount that the original Imagine Capital loan on the property, notwithstanding the fact that the property may not have been improved at all during the first loan period.

241.    The transaction sale price from the first Imagine Capital borrower to the second Imagine Capital borrower may be manipulated or artificially inflated as to support or facilitate the subsequent procurement of a fraudulent mortgage.

242.    In fraudulent cases, the "subsequent purchaser" may be also be a "straw buyer" that is acting as an agent of the Enterprise.

243.    Upon information and belief, the "New" Straw Borrower Resale and "Subsequent "Purchaser" Acquisition Scenario is fairly uncommon and accounted for only approximately one of the transactions shown in Exhibit 1.

244.    Upon information and belief, the Imagine Capital Straw Borrower Land

Holding Company "Refinancing" Mortgage Scenario was a common a scenario that was

actually used to procure many fraudulent mortgages.[37].

245.    Upon information and belief, some of the examples discussed *supra* that

involved LREH and the nine properties in Loan Ref. No. 149 follow the Imagine Capital

Straw Borrower Land Holding Company "Refinancing" Mortgage Scenario.[38]

246.    Upon information and belief, in this scenario, a property (typically of little or

no value) is transferred to an Enterprise Straw Borrower Land Holding Company.

247.    Upon information and belief, subsequent to the transfer, the Straw Borrower

Land Holding Company executes an Indemnity Deed of Trust in favor of Imagine Capital,

which purports to consummate a Type 9 or Type 10 Loan transaction with the Straw Borrower

Land Holding Company.

248.    Upon information and belief, a fake guarantor executes the promissory note and

deed of trust in favor of Imagine Capital on behalf of the Straw Borrower Land Holding

Company.

249.    Upon information and belief, at some point later, the Straw Borrower Land

Holding Company "refinances" the Imagine Capital loan with a conventional or Government-

insured mortgage generally issued in the name of the Straw Borrower Land Holding

Company.

---

[37] Transactions following the Imagine Capital Straw Borrower Land Holding Company "Refinancing" Mortgage Scenario" have an "Overall Pattern" designation #5 in Exhibit 1.

[38] In the LREH example, there were eight properties with fraudulent mortgages. However, because the fraudulent mortgages on some of the properties were actually procured in the name of a party other than the Straw Borrower Land Holding Company, they are classified under a different pattern.

250. Upon information and belief, in Exhibit 1, the transactions implicating the Straw Borrower Land Holding Company "Refinancing" Mortgage are all fraudulent.

251. Upon information and belief, the Straw Borrower Land Holding Company "Refinancing" Mortgage Scenario accounts for approximately of the transactions in Exhibit 1.

> vi. *Imagine Capital Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario.*[39]

252. Upon information and belief, the Imagine Capital Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario is similar to the second and fourth scenarios except that it involves only one Imagine Capital borrower, who is generally believed to be a legitimate would-be borrower, and the property is first conveyed to an Imagine Capital Enterprise Direct Land Holding Company, which subsequently resells the property to a "subsequent purchaser" in an apparent arms-length transaction.

253. Upon information and belief, for whatever reason, the first borrower's loan is declared to be in "default" and the borrower is directed to execute a Deed in Lieu of Foreclosure or told the property will be foreclosed upon by Imagine Capital. Ultimately, the Imagine Capital Direct Land Holding Company obtains control of the property "resells" it to the "subsequent purchaser."

254. Upon information and belief, in the fraudulent cases, the "subsequent purchaser" may be a straw buyer and/or the resale price is manipulated as to artificially support a higher mortgage amount by the "subsequent purchaser."

255. Upon information and belief, the transaction is funded by a conventional or Government-insured mortgage that is obtained in the name of the "subsequent purchaser."

---

[39] Transactions following the Imagine Capital Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario have an "Overall Pattern" designation #6 in Exhibit 1.

256.    Upon information and belief, the Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario accounted for approximately five of the transactions shown in Exhibit 1.

257.    A classic example of the Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario is the property that was conveyed to Boomerang on September 23, 2009 by the Relator.

258.    The property conveyed to Boomerang by the Relator is 2138 Hollins St., Baltimore, MD 21223 (hereinafter "the Hollins Street Property").[40]

259.    Upon information and belief, Boomerang resold the property to a straw buyer, Stephanie O. Mballa on April 29, 2010.

260.    Upon information and belief, the Hollins Street Property was not significantly improved between the time the Relator conveyed the Property to Boomerang in September 2009 for $65,000.00, and the time that Boomerang flipped the property to Mballa for $122,000.00.[41]

261.    Upon information and belief, the Imagine Capital Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario is depicted in the diagram above.

262.    Upon information and belief, Mballa had a subsequent mortgage FHA-insured mortgage, which is currently in foreclosure.

263.    Upon information and belief, Mballa's mortgage was assigned to Cardinal Financial Company, L.P. and later assigned to Wells Fargo.

---

[40] *See* Exhibit 1, Mort. Case Ref. No. 157.
[41] Upon information and belief, false information was provided in the appraisal of the Hollins St. Property regarding the timing of certain improvements therein such as to make it appear that a higher sale price was justifiable because the Hollins Street Property had been improved between September 2009 and April 2010.

264. Upon information and belief, the Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario is more likely to be seen following Type 4 or Type 5 Imagine Capital Enterprise mortgages where a property with some value is actually posted as collateral for an Imagine Capital Enterprise loan.

### vii. *Related Party "Refinancing" Mortgage Scenario.*[42]

265. Upon information the Related Party "Refinancing" Mortgage Scenario is the third most common pattern observed among the 192 transactions presented in Exhibit 1.

266. The Related Party "Refinancing" Mortgage Scenario can involve any of the Imagine Capital Loan Types. For example, if a Type 10 Imagine Capital loan is made to a Straw Borrower Land Holding Company, and the property is subsequently transferred to the fake guarantor who then obtains a conventional or Government-insured mortgage, the transaction is classified into the Related Party "Refinancing" Mortgage Scenario.

267. The Related Party "Refinancing" Mortgage Scenario is similar to the Direct Borrower "Refinancing Mortgage Scenario except that prior to obtaining the "refinancing" conventional or Government-insured mortgage, the Imagine Capital borrower transfers the subject property to a related party in a non-arm's length transaction, and then subsequently obtains the "Refinancing" Mortgage.

268. The Deed purporting to transfer the subject property may be a no-consideration deed, or it may be noted as having some value for the consideration on its face.

269. The Related Party "Refinancing" Mortgage Scenario can involve a number of different related party types (e.g., Imagine Capital borrower is an entity and property is

---

[42] Transactions following the Related Party "Refinancing" Mortgage Scenario have an "Overall Pattern" designation #7 in Exhibit 1.

transferred to an individual, an extra person is placed on the deed, someone is removed from the deed, the property is seemingly transferred to a relative of the Imagine Capital borrower, etc.).

270.    In some cases, the Related Party "Refinancing" Mortgage Scenario can involve a property transferred from an individual to a related entity with the mortgage obtained in the name of the entity.

271.    Upon information and belief, as compared to the Direct Borrower "Refinancing" Scenario, the Related Party "Refinancing" has a somewhat higher propensity to be fraudulent.

272.    Upon information and belief, the Related Party "Refinancing" Scenario accounted for approximately 27 of the cases presented in Exhibit, resulting in conventional and Government-insured mortgages in the aggregate principal amount of approximately $3.6 Million.

273.    A classic example of the Related Party "Refinancing" Mortgage Scenario is the Type 10 loan transaction to the Straw Borrower Land Holding Company 3814 Beehler Ave., LLC.[43] Upon information and belief, the subject property, 3814 Beehler Ave., Baltimore, MD 21215, was transferred to the fake guarantor, Alexander Pamphilis, from the Straw Borrower Land Holding Company for a purported amount of $59,186.00 on December 21, 2007, presumably to facilitate the procurement of the fraudulent mortgage from Bank of America, N.A. on March 14, 2008, in the amount of $130,000.00.[44]

---

[43] Exhibit 3, Loan Ref. No. 102. Exhibit 1, Mort. Case. No. 67.
[44] See L.R., 10585/569. It is notable that according to permits records, the property had not been improved since it was originally acquired by Delfin Designs, LLC for $20,000.00 on or about June 9, 2004. See L.R. Balt. City, FMC 6381/1042.

274. Another classic example of the Related Party "Refinancing" Mortgage Scenario involves the property at 1404 Darley Ave., Baltimore, MD 21213 (hereinafter "the Darley Ave. Property").

275. Upon information and belief, the Darley Ave. Property was acquired by Cecilia Sage (hereinafter "Sage"), on or about February 8, 2007 for a purported acquisition price of $35,000.00.[45]

276. Upon information and belief, the Imagine Capital Enterprise, contemporaneously with the acquisition of the Darley Ave. Property, Imagine Capital purported to loan $42,000.00 to Sage in a Type 2 Loan Transaction.[46]

277. Upon information and belief, despite the fact that no permits were issued on the Darley Ave. Property during the Type 2 Loan Period, the property was subsequently transferred in a related party transaction from Sage alone to Louis Salviejo, Jr. and Sage for stated consideration of $43,987.50.[47]

278. Upon information and belief, On or about June 22, 2007, a conventional mortgage with MIN number 100150100704180003 in the principal amount of $87.975.00 was procured in the name of Salviejo and Sage from Atlantic Financial, Inc.[48]

279. On or about February 27, 2009, a foreclosure action was commenced on the Darley Ave. Property, encaptioned Edward S. Cohn v. Louis Salviejo, Jr., et al., Case No. 24-O-09-000994, Cir. Ct. for Balt. City. The mortgage debt claimed in that action was $90,406.95.

---

[45] L.R. Balt. City, FMC 9102/687.
[46] Ex. 3, Loan Ref. No. 49.
[47] L.R. Balt. City, FMC 9726/111.
[48] L.R. Balt. City, FMC 9726/116.

280. On or about October 1, 2009, the property was transferred to the Federal National Mortgage Association (Fannie Mae) for purported consideration of $74,437.30.[49]

281. On July 28, 2011, the Federal National Mortgage Assn. finally resold the Darley Ave. Property for $13,500.00, a strong indication that it was nothing more than a shell.[50]

viii. *Direct Refinancing and "Subsequent Purchaser" Acquisition Mortgages Combo Scenario*[51]

282. The Direct Refinancing and "Subsequent Purchaser" Acquisition Mortgages Combo Scenario effectively describes the pattern involving a combination of the Direct Borrower "Refinancing" Scenario and the Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario.

283. Upon information and belief, the Direct Refinancing and "Subsequent Purchaser" Acquisition Mortgages Como Scenario accounted for approximately four of the transactions presented in Exhibit 1.

ix. *Suspected Sham Subordinate Mortgage Assignment Scenario*[52]

284. The Suspected Sham Subordinate Mortgage Assignment Scenario accounts for two of the transactions presented in Exhibit 1.

285. In this scenario an Imagine Capital borrower transfers a property to another Imagine Capital borrower who receives a new purported loan for the transaction from Imagine

---

[49] L.R. Balt. City, FMC 12121/1.

[50] L.R. Balt. City, FMC 13721/461.

[51] Transactions following the Direct "Refinancing and Subsequent "Subsequent Purchaser" Acquisition Mortgages Combo Scenario have an "Overall Pattern" designation #8 in Exhibit 1. In these cases, there are really two mortgages: (1) the Imagine Capital Borrower's mortgage; and (2) the subsequent purchaser's mortgage. Only the more recent mortgage is presented in Exhibit 1.

[52] Transactions following the Imagine Capital Straw Borrower Land Holding Company "Refinancing" Mortgage Scenario" have an "Overall Pattern" designation #9 in Exhibit 1.

Capital (*i.e.*, a Type 8 Loan) or who otherwise purports to assume the indebtedness of the first Imagine Capital loan.

286.    Upon information and belief, the first Imagine Capital borrower is given a mortgage for part of the purported property transfer price.

287.    Upon information and belief, the first Imagine Capital borrower's mortgage is then subordinated to the Imagine Capital Enterprise loan by execution of a Subordination Agreement.

288.    Upon information and belief, the first Imagine Capital borrower then assigns the subordinated mortgage for cash value and there is an infusion of cash into the transaction.

289.    Upon information and belief the value of the security property is not sufficient in reality for the assigned subordinated mortgage to have any real value.

x.    *The Retained Security Interest "Refinancing" Mortgage Scenario*[53]

290.    Upon information and belief, the Retained Security Interest "Refinancing" Mortgage Scenario is much like the first Direct Borrower "Refinancing" Mortgage Scenario, except that, for whatever reason, the Imagine Capital Enterprise's loan does not actually get released notwithstanding the fact that the property is refinanced.

291.    The case involving 702 Dolphin St., Baltimore, MD 21217 (hereinafter "the Dolphin St. Property") is a prime example of the Retained Security Interest "Refinancing" Mortgage Scenario.[54]

---

[53] Transactions following the Imagine Capital Straw Borrower Land Holding Company "Retained Security Interest "Refinancing Scenario" have an "Overall Pattern" designation #10 in Exhibit 1.
[54] *See* Ex.1, Mort. Ref. No. 23; *See also* Wachovia Bank v. H&W Architecture, LLC, Case No. 24-C-07-009678, Cir. Ct. Balt. City.

| | | TABLE 14 | | | | | |
|---|---|---|---|---|---|---|---|
| | ROLLUP OF SCENARIOS PERTAINING TO PROCUREMENT OF CONVENTIONAL AND GOVERNMENT-INSURED MORTGAGES | | | | | | |
| Pattern No. | Scenario | Freq. All Mort. | Freq. High Prop. Only | Freq. High + Mod | Est. Total Aggrg. Prin. All Mortgages | Est. Total Aggrg. Prin. Amt. High + Mod. Prop | Est. Total Aggrg. Prin. Amt. High-Prop. |
| 1 | The Direct Borrower "Refinancing" Mortgage Scenario | 57 | 40 | 27 | $ 5,498,626.00 | $3,651,056.00 | $ 2,732,240.00 |
| 2 | Direct Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario | 86 | 66 | 39 | $ 12,997,946.00 | $9,399,743.00 | $ 4,954,331.00 |
| 3 | "New" Straw Borrower "Refinancing" Mortgage Scenario | 5 | 5 | 4 | $ 417,175.00 | $ 417,175.00 | $ 350,380.00 |
| 4 | "New" Straw Borrower Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario | 1 | 1 | 1 | $100,000.00 | $ 100,000.00 | $100,000.00 |
| 5 | Imagine Capital Straw Borrower Land Holding Company "Refinancing" Mortgage Scenario | 4 | 4 | 4 | $ 313,321.00 | $ 313,321.00 | $ 313,321.00 |
| 6 | Imagine Capital Direct Land Holding Company Resale and "Subsequent Purchaser" Acquisition Mortgage Scenario | 5 | 5 | 1 | $613,541.00 | $ 613,541.00 | $119,790.00 |
| 7 | Related Party "Refinancing" Mortgage Scenario | 27 | 23 | 15 | $3,650,048.70 | $2,916,198.70 | $2,160,898.70 |
| 8 | Direct Refinancing and "Subsequent Purchaser" Acquisition Mortgages Combo Scenario | 4 | 3 | 2 | $ 600,291.00 | $ 459,641.00 | $324,314.00 |
| 9 | Suspected Sham Subordinate Mortgage Assignment Scenario | 2 | 2 | 2 | $ 41,000.00 | $ 41,000.00 | $41,000.00 |
| 10 | The Retained Security Interest "Refinancing" Mortgage Scenario | 1 | 1 | 1 | $ 278,000.00 | $ 278,000.00 | $ 278,000.00 |
| | TOTALS | 192 | 96 | 150 | $ 24,509,948.70 | $11,374,274.70 | $18,189,675.70 |

## B. General Failure to Discharge Duties of the Direct Endorsement Lender Program

| TABLE 15 | | | | | | |
|---|---|---|---|---|---|---|
| ESTIMATED NUMBER OF SUBJECT MORTGAGES ORIGINATED BY DIRECT ENDORSEMENT LENDER ACCORDING TO ESTIMATED FRAUD RATING | | | | | | |
| **Direct Endorsement Lender** | **Aggregate Principal Amount High-Propensity** | **Aggregate Principal Amount High + Mod Prop.** | **Aggregate Principal Amount All Mortgages** | **High-Propensity Mortgages** | **High + Mod. Prop. Mortgages** | **All Gov't-Ins. Mortgages** |
| Wells Fargo | $ 600,718.00 | $ 1,283,960.00 | $ 1,823,437.00 | 5 | 8 | 11 |
| First Home Mortgage | $ 252,556.00 | $    252,556.00 | $    356,593.00 | 2 | 2 | 3 |
| Bank of America | $ 122,970.00 | $    466,139.00 | $    466,139.00 | 1 | 2 | 2 |
| **TOTALS** | **$ 976,244.00** | **$ 2,002,655.00** | **$ 2,646,169.00** | **8** | **11** | **16** |

292.    Upon information and belief, each of the three Direct Endorsement Lenders listed in Table 15 above, originated the volume and total aggregate principal amount of mortgages as listed in the table.

293.    Upon information and belief, Wells Fargo originated and certified for FHA mortgage insurance by far the highest number of Government-insured mortgages of any Direct Endorsement Lender listed in Exhibit 1.

294.    Upon information and belief Wells Fargo originated and certified for insurance by FHA approximately 11 of the Government-insured mortgages listed in Exhibit 1.

295.    Upon information and belief, approximately 5 to 8 of the Government-insured mortgages originated by Wells Fargo were fraudulent.

296.    Upon information and belief, approximately $1.2 Million to $1.8 Million of the Government-insured mortgages listed in Exhibit 1 and originated and certified by Wells Fargo were fraudulent.

297.    Upon information and belief, Wells Fargo was the assignee for additional mortgages originated by other Direct Endorsement Lenders listed in Exhibit 1.

298.    Upon information and belief, Wells Fargo originated and certified Government-insured mortgages on worthless shell properties listed in Exhibit 1.

299.    Upon information and belief, First Home Mortgage originated and certified 3 mortgages listed in Exhibit 1.

300.    Upon information and belief, First Home Mortgage originated a fraudulent mortgage with FHA Case No. 241-7921715-703 as shown in Table 16 *supra* (Exhibit 1, Ref No. 44).

301.    Upon information and belief, FHA Case No. 241-7921715-703 has already resulted in losses to the Government or approximately $110,000.

302.    Upon information and belief, Bank of America originated and certified at least two of the Government-insured mortgages listed in Exhibit 1.

303.    Upon information and belief, Bank of America originated and certified a fraudulent mortgage with FHA Case No. 241-8287372-703 (Exhibit 1, Ref. No. 104) as shown in Table 16, *supra*.

304.    Upon information and belief, FHA Case No. 241-8287372-703 has already resulted in losses to the Government of approximately $170,000.

305.    Upon information and belief, each of the cases presented in Table 16 involved straw buyers who were approved for an FHA-insured mortgage based upon false statements and information submitted by the Mortgage Originators.

306.    Upon information and belief, the Direct Endorsement Lender Defendants who originated the fraudulent mortgages in Exhibit 1 failed to adequately discharge their responsibilities pursuant to the Direct Endorsement Lender Program and either knew or

should have known that each of the subject transactions, in which they were involved, was fraudulent and should not have certified them.

307. Upon information and belief, after the settlement for each respective transaction, the Direct Endorsement Lender Defendants submitted falsified documentation to FHA regarding the fraudulent mortgages in Exhibit 1.

308. Upon information and belief, the Direct Endorsement Lender acted recklessly and fraudulently in accepting several mortgages that violated program rules and which they knew would cause losses to the Government.

309. Upon information and belief, First Home Mortgage and Bank of America acted recklessly in accepting the mortgages with FHA Case No. 241-7921715-703 and FHA Case No. 241-8287372-703, respectively.

310. Upon information and belief, the Direct Endorsement Lender Defendants generally profited from the resale of Government-insured mortgages, and provided incentives to agents and employees to generate and certify as many FHA-insured loans as possible without regard for their fraudulent or otherwise ineligible character for FHA insurance.

311. Upon information and belief, the Direct Endorsement Lender Defendants failed to adequately invest resources into ensuring the quality of their FHA-insured mortgages through the implementation and maintenance of effective quality review controls.

312. Upon information and belief, Wells Fargo was the intended and immediate assignee for several additional fraudulent Government-insured mortgages listed in Exhibit 1.

313. Upon information and belief, Wells Fargo recklessly or intentionally approved these mortgages without regard for the truthfulness of the information submitted in the loan

applications and without regard for whether the borrowers were actually legitimate purchasers of the properties who planned to inhabit the respective properties as represented to FHA.

314. Upon information and belief, notwithstanding the representations made to FHA, many subject properties were nothing more than mere shells that are uninhabitable and have nominal resale value.

315. Upon information and belief, the market value of each subject property is substantially inadequate to secure the principal amount of each respective FHA-insured mortgage, ensuring inevitable losses to the Government from each transaction.

316. Upon information and belief, in many of the cases that were originated by Wells Fargo and the other Direct Endorsement Lender Defendants in Exhibit 1, Wells Fargo and the other Direct Endorsement Lender Defendants transmitted materially false documents to FHA, including but not limited to:

> a. False HUD-1 settlement statements that purported to memorialize the disbursement of proceeds from real estate transactions;

> b. False appraisals and material information concerning the value and condition of secured properties;

> c. False information concerning borrowers, their intention to reside in the subject properties, their ability to repay the mortgage obligations, and the amount of assistance provided to buyers for real estate closings; and

> d. Submitting false claims for ultimate payment by the Government.

317. Upon information and belief, the Direct Endorsement Lender Defendants were indifferent to whether the subject mortgages were legitimate because they profited

irrespective of whether the Government would ultimately be forced to pay false claims on the transactions.

318.    Upon information and belief, claims for payment have already been submitted to the Government on several of the subject transactions as listed in Table 15, and many more appear to be imminent.

319.    The Relator brings this action to seek damages and penalties for the past and future claims that violate the False Claims Act, 31 U.S.C. §§ 3729 et seq., and assist the Government in recovering for these fraudulent mortgage transactions. On behalf of the United States, the Relator seeks treble damages and the maximum penalties recoverable, pursuant to the False Claims Act.

## C.    *Specific Counts*

### COUNT I
### (Violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), Causing False Claims)
*Against All Defendants*

320.    The Relators incorporate each of the preceding paragraphs by reference, as if fully restated herein.

321.    This claim applies any and all Government-insured mortgages in Exhibit 1, including but not limited to: Mort. Ref. No. 11, Mort. Ref. No. 44, and Mort. Ref. No. 104 that have already or are anticipated to result in losses to Government.

322.    The Relator seeks relief against the Defendants pursuant to Section 3729(a)(1)(A) of the False Claims Act, 31, U.S.C. §3729(a)(1)(A).

323.    As set forth above, the Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to an officer

or employee of the Government, false and fraudulent claims for payment or approval in connection with of the endorsement of FHA-insured mortgages.

324. The Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages wrongfully endorsed by the Direct Endorsement Lender Defendants because of the Defendants' wrongful conduct.

325. By reason of the false claims of the Defendants, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

WHEREFORE, Plaintiff, United States of America, through Relator, requests the Court enter the following relief:

A. That the Defendants be ordered to cease and desist from further and ongoing violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

B. That this Court enter judgment against the Defendants, and in favor of the United States of America, in an amount equal to three times the amount of damages the United States of America has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729(a)(1)(A);

C. That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act.

D. That the Relator be awarded all costs of this action, including attorneys' fees and expenses; and

E. That the Relator recovers such other relief as the Court determines to be just and proper.

## COUNT II
## (Violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), Use of False Statements)
*Against All Defendants*

326. The Relator incorporates each of the preceding paragraphs by reference, as if fully restated herein.

327. The Relators seek relief against the Defendants pursuant to Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

328. As set forth above, the Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with the endorsement of the FHA-insured mortgages enumerated herein.

329. The Government paid insurance claims, and incurred losses, relating to wrongfully- endorsed FHA-insured mortgages because of the Defendants' wrongful conduct.

330. By reason of the false records and/or statements of the Defendants, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

WHEREFORE, Plaintiff, United States of America, through Relator, requests the Court enter the following relief:

A. That the Defendants be ordered to cease and desist from further and ongoing violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

B. That this Court enter judgment against the Defendants, and in favor of the United States of America, in an amount equal to three times the amount of damages the United States

of America has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729(a)(1)(B);

     C.     That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act.

     D.     That the Relator be awarded all costs of this action, including attorneys' fees and expenses; and

     E.     That the Relator recover such other relief as the Court determines to be just and proper.

## COUNT III
### (Violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(G), Reverse False Claims)
*Against All Defendants*

331.     The Relator incorporates each of the preceding paragraphs by reference, as if fully restated herein.

332.     The Relator seeks relief against the Defendants pursuant to Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. §3729(a)(1)(G).

333.     As set forth above, the Defendants knowingly made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

334.     The Government paid insurance claims, and incurred losses, relating to fraudulent FHA-insured mortgages because of the Defendants' wrongful conduct.

335. By virtue of the false records or statements made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

WHEREFORE, Plaintiff, United States of America, through Relator, requests the Court enter the following relief:

A. That the Defendants be ordered to cease and desist from further and ongoing violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(G);

B. That this Court enter judgment against the Defendants, and in favor of the United States of America, in an amount equal to three times the amount of damages the United States of America has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729(a)(1)(G);

C. That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act.

D. That the Relator be awarded all costs of this action, including attorneys' fees and expenses; and

E. That the Relator recover such other relief as the Court determines to be just and proper.

## COUNT IV
### (Violations of the False Claims Act, 31 U.S.C. §3729(a)(3), Conspiracy)
*Against Svehlak, Roseman, and the Imagine Capital Defendants*
*(hereinafter in Count IV, "the Enterprise Defendants")*

336.    The Relator incorporates each of the preceding paragraphs by reference, as if fully restated herein.

337.    The Relator seeks relief against the Enterprise Defendants for intentionally, knowingly, and recklessly conspiring to defraud the Government by causing the issuance of dozens of false or fraudulent Government-insured mortgages and false and fraudulent claims to be allowed and paid in violation of 31 U.S.C. §3729(a)(3).

338.    By virtue of the conspiracy to defraud the Government by the Enterprise Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

WHEREFORE, Plaintiff, United States of America, through Relator, requests the Court enter the following relief:

A.      That the Enterprise Defendants be ordered to cease and desist from further and ongoing violations of the False Claims Act, 31 U.S.C. §3729(a)(3), conspiring to defraud the Government by causing a false or fraudulent claim to be paid;

B.      That this Court enter judgment against the Enterprise Defendants, and in favor of the United States of America, in an amount equal to three times the amount of damages the United States of America has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729(a)(3);

C.    That the Relator be awarded the maximum amount allowed pursuant to

§3730(d) of the False Claims Act;

D.    That the Relator be awarded all costs of this action, including attorneys' fees

and expenses; and

E.    That the Relator recover such other relief as the Court determines to be just and

proper.

Respectfully submitted,

Jason E. Rheinstein, Esq.
Federal Bar No.: 28433
P. O. Box 1369
Severna Park, MD 21146
(410) 647-9005 (t)
(410) 647-6135 (f)
jason@jer-consulting.com
*Attorney for Relator*

## Certificate of Service

The undersigned hereby certifies that a copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses has been served on the Government as provided in FRCP 4.

Jason E. Rheinstein